**LEVI & KORSINSKY LLP**
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, A 90071
Tel: (213) 985-7290

[*Additional counsel on signature page*]

*Attorneys for Lead Plaintiffs Sharyn McGowan,*
*Kreling & Company I401k Plan, Matthew Kreling,*
*and Ricardo Salias and Lead Counsel for the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH RODRIGUEZ, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GIGAMON INC., PAUL A. HOOPER, and MICHAEL J. BURNS,<br><br>Defendants. | CASE NO.: 5:17-cv-00434-EJD<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Sharyn McGowan, Kreling & Company I401k Plan, Matthew Kreling, and Ricardo Salinas ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Gigamon, Inc. ("Gigamon" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and

press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the securities of Gigamon between October 27, 2016, and February 2, 2017, inclusive (the "Class Period"), seeking to recover compensable damages caused by the defendants' violations of federal securities laws.  This Complaint alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Gigamon is a technology company that provides software and services to other companies. Gigamon's product offerings are designed to assist customers monitor and control data traveling across internet networks. With better visibility and control over data, customers can enhance the speed at which data travels as well as strengthen security against network intruders. Gigamon sells its products directly through its own sales force as well indirectly through channel partners.

3.     Gigamon reported its financial results on a routine basis. Every quarter, the Company's Chief Executive Officer, Defendant Paul Hooper ("Hooper"), and Chief Financial Officer, Defendant Michael J. Burns ("Burns"), hosted an investor conference call. Hooper and Burns provided the public with operational and financial information during these conference calls. Analysts would attend the conference calls and, afterwards, report to the public about what was said. Importantly, Hooper and Burns routinely provided investors with estimates concerning Gigamon's future revenue.

4.     This case focuses on Gigamon's statements about its financial earnings for the fourth quarter of fiscal 2016; specifically, the Company's revenue. On October 27, 2016, the Company held a conference call with investors and analysts to discuss the Company's third quarter 2016 financial results. During that call, Defendants provided the public with an estimate concerning its revenue and backlog for the fourth quarter, which by that point in time, was almost halfway complete. Defendant Hooper stated, "As we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability." Based on large deferred service revenue and healthy product backlog, Defendants estimated fourth quarter revenue to be "in the range of $91 million to $93 million."

5.     The market reacted swiftly to Defendants' statements. On October 28, 2016, the first trading day following the October 27, 2016 conference call, the price of Gigamon's common stock increased from $47.38 per share to $55.01 per share on unusually heavy trading volume. Several stock analysts made note of the revised revenue estimates in their reports about the Company. For example, JMP analysts began their October 28, 2016 report with, "We maintain our Market Perform rating after Gigamon reported 3Q16 EPS of $0.36 (JMP $0.30; consensus $0.31) on revenues of $84M (JMP $79M; consensus $80M) and *guided to 4Q16 EPS of $0.36-0.38 (JMP/consensus $0.33) on revenues of $91-93M (JMP/consensus $86M), leading the shares to trade up 9% in the aftermarket*" (emphasis added).

6.     Unbeknownst to investors at the time, Defendants did not have a reasonable basis in fact for the revenue estimate that they provided. As of October 27, 2017, Defendants knew that key customers were in the process of deferring purchases that were likely to have a significant negative impact on the Company's revenue for the quarter. Moreover, Defendants were aware that Gigamon's sales "backlog" would not be sufficient to compensate for the deferred purchase from this customer, *i.e.*, the Company would not be able to meet its revised revenue estimate by relying on its "backlog." Proof of this is evident in the fact that Defendant Hooper, just five days

later on November 2, 2016, mentioned in an interview that Gigamon was expecting $315 million in revenue for the year, which meant that revenue for the fourth quarter was expected to be approximately $89 million. In other words, Hooper's statements on November 2, 2016 showed that Gigamon was expecting less revenue—between 2% and 5% less revenue—than Burns stated just a few days earlier.

7.     Defendants' knowledge about Gigamon's true revenue estimates was materially adverse and not public. Notwithstanding, a number of Gigamon's insiders proceeded to sell significant amounts of stock while in possession of this information. In total, the proceeds from these insider sales amounted to more than $14.5 million, not including Defendant Burns' sale of over 20,000 shares of Gigamon stock. As explained herein, these sales were atypical in timing and size, and support a strong inference that Defendants acted with scienter when making the false revenue estimate at issue in this case.

8.     The truth about Gigamon's fourth quarter revenue did not emerge until January 17, 2017. At that time, the Company issued a press release entitled "Gigamon Announces Preliminary Fourth Quarter and Fiscal Year 2016 Results." Therein, the Company disclosed preliminary fourth quarter 2016 revenue of "$84.5 million to $85.0 million, compared to the Company's prior guidance of $91 million to $93 million." The press release also quoted Defendant Hooper stating that "fourth quarter revenue was below our prior guidance" and that "[f]ourth quarter revenue fell short primarily due to lower than expected product bookings in our North America West region, as several significant existing customer accounts deferred purchasing decisions into 2017."

9.     The market reacted sharply to Defendants' revelation. Analysts at Credit Suisse, Doughterty & Company, JMP, Rosenblatt, and William Blair all released reports in response to the January 17, 2017 revelations. The analysts' reports faulted Gigamon for providing the October 27, 2017 estimate, only to miss it so significantly just weeks later.  JMP stated, "[T]he Company preannounced F4Q16 EPS of $0.35-0.37 on revenues of $84.5-85.0M, falling short of the

consensus and our estimate for EPS of $0.37 on revenues of $92M, leading the stock to trade down ~22% in the aftermarket." Investors also responded negatively to the news. The price of Gigamon's common stock fell $12.65 per share, or 28.7%, to close at $31.40 per share on January 18, 2017, on unusually heavy trading volume.

10.      Two weeks later, during an investor conference call on February 2, 2017, Defendants elaborated upon their revenue shortfall in the fourth quarter. Defendant Hooper explained that the shortfall was "due to lower than expected bookings in our North America west region, as several significant larger accounts deferred purchasing decisions into 2017." Rex Jackson, the Chief Financial Officer that replaced Defendant Burns, stated further that "product backlog at quarter end was $3.1 below our range of approximately $6 million to $8.5 million of proceeding six quarters."

11.      Analysts responded quickly and, in some cases, severely to Defendants' additional disclosures. William Blair, for example, noted the after-hours stock trading price of roughly $27, and wrote:

> Gigamon's fourth quarter was every bit as bad as its first three quarters of the year were good. **Reported fourth-quarter revenue of $85 million missed initial revenue guidance by 8%, but this actually understates how bad the shortfall really was; end-of-year backlog was almost nonexistent, suggesting that the Company pulled business from the first quarter.** The obvious question is how can a company humming along so nicely for two years hit a brick wall so abruptly?

(emphasis added)

12.      In response to Defendants' additional statements confirming and elaborating on Gigamon's fourth quarter revenue shortfall, the price of Gigamon's common stock declined further. Between February 2, 2017 and February 3, 2017, Gigamon's common stock price fell from $32.10 to $30.40, or an additional 5.3% on heavy trading.

13.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. § 78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as the Company conducts business in this district.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Lead Plaintiffs purchased Gigamon securities at artificially inflated prices during the Class Period and has been damaged thereby.  Lead Plaintiffs' transactions in Gigamon securities were filed with the Court earlier in this action as an exhibit to a declaration in support of their motion for appointment as lead plaintiffs.  ECF Nos. 45-1, 45-2, 45-3.  Lead Plaintiffs incorporate by reference their certifications, and the information contained therein, into this Complaint as if it were set forth fully below.

19.     Defendant Gigamon Inc. is a Delaware corporation headquartered in Santa Clara, California. Gigamon's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "GIMO."

20.     Defendant Paul A. Hooper was, at all relevant times, the Chief Executive Officer ("CEO") of Gigamon.

21.     Defendant Michael J. Burns was the Chief Financial Officer ("CFO") of Gigamon at all relevant times until October 27, 2016. On November 9, 2016, Burns entered into a mutual

1   separation and release agreement with the Company pursuant to which Burns would remain

2   employed with the Company and provide "reasonable transition services" from October 27, 2016,

3   until February 28, 2017. Non-party Rex Jackson became CFO of Gigamon following Burns'

4   resignation.

5   22.   Defendants Hooper and Burns (collectively the "Individual Defendants"):

6   (a)   directly participated in the management of the Company;

7   (b)   were directly involved in the day-to-day operations of the Company at the highest

8   levels;

9   (c)   were privy to confidential proprietary information concerning the Company and

10   its business and operations;

11   (d)   possessed the power and authority to control the contents of Gigamon's reports to

12   the SEC, press releases and presentations to securities analysts, money and

13   portfolio managers and institutional investors, i.e., the market;

14   (e)   were involved in drafting, producing, reviewing and/or dissemination the false and

15   misleading statements and information alleged herein;

16   (f)   were provided with copies of the Company's reports and press releases alleged

17   herein to be misleading prior to, or shortly after, their issuance and had the ability

18   and opportunity to prevent their issuance or cause them to be corrected;

19   (g)   were aware of or recklessly disregarded the fact that the false and misleading

20   statements were being issued concerning the Company; and

21   (h)   approved or ratified these statements in violation of the federal securities laws.

22   23.   As officers, directors, and/or controlling persons of a publicly-held company

23   whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was

24   traded on NYSE and governed by the provisions of the federal securities laws, Hooper and Burns,

25   each had a duty to disseminate accurate and truthful information promptly with respect to the

26   Company's financial condition and to correct any previously-issued statements that had become

27

28

materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

24.     Gigamon is liable for the acts of Hooper, Burns, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

25.     The scienter of Hooper, Burns, and other employees and agents of the Company are similarly imputed to Gigamon under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

26.     Gigamon develops solutions that deliver "pervasive and dynamic intelligent visibility and control of traffic across networks." The Company claims its "Visibility Fabric" enables visibility, modification, enhancement, and control of network traffic. The Company's "GigaSECURE Security Delivery Platform" leverages its Visibility Fabric to streamline security operations by providing comprehensive visibility across the network to a variety of security tools including those typically used by enterprises. The Company claims its solutions enables security teams and IT personnel to gain advanced visibility into their IT infrastructure. GIMO's revenue comes from 69% product sales and 31% service sales.

27.     Gigamon generates product revenue primarily from sales of perpetual software licenses installed on physical appliances for their Visibility Fabric. Gigamon generally recognizes product revenue at the time of product delivery, provided that all other revenue recognition criteria have been met.

28.     The length of Gigamon sales cycles typically ranges from three to six months and are generally longer the larger the size of the transaction. Sales cycles are the course of time between the initial contact with a customer, the identification of services or goods to be procured, the acceptance of the intended purchase, and the transaction that completes the sale. Often times, Gigamon's larger transactions are part of larger data center projects or upgrades by their

customers, thus they have little ability to influence the timing of these transactions. As a result, sales cycles can often be more than six months, with sales cycles involving service providers taking significantly longer to complete. Due to Gigamon's long sales cycles, the Company had more visibility into and control over its backlog and sales forecasts.

29.     Product backlog includes orders for products scheduled to be shipped within 90 days to customers with approved credit status, and is net of service revenue allocations and any rebates and discounts. Gigamon relies on product backlog when estimating revenue. Defendant Hooper repeatedly made note of Gigamon's healthy backlog and how it relates to revenue. For instance, analysts from William Blair summarized highlights from a September 14, 2016 meeting with Defendant Hooper and wrote, "Without commenting on the current quarter, Mr. Hooper noted that quarterly visibility remains high with a guidance methodology that focuses on backlog build at quarter-end . . ." Hooper emphasized the Company's backlog during the October 27, 2017 conference call, at which time Hooper stated, "As we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability."

30.     In addition to product revenue, Gigamon generates revenue from selling services. Gigamon's services include maintenance and support contracts, which are often times bundled with sales of products. Gigamon offers tiered maintenance and support services under renewable, fee-based maintenance and support contracts, which include technical support, bug fixes, patches and unspecified upgrades on a when-and-if-available basis. Gigamon recognizes service revenue ratably over the duration of the contract, which is typically one year and can be for multiple years depending on the customer contract.

**B.      Defendants Provided Investors and Analysts with a Materially Misleading Revenue Forecast**

31.     On October 27, 2016, the Company filed a current report (Form 8-K) and issued a press release stating that Defendant Burns, the CFO at the time, was resigning from the Company,

effective immediately, and that Defendant Rex Jackson would be the new CFO. Later that day, Defendant Hooper addressed this issue and said, "Mike has made important contributions to the team at Gigamon and is now ready to move on to pursue his next career opportunity."

32.   Later that day, the Company held a conference call with investors and analysts to discuss the Company's third quarter 2016 financial results. During that call, Defendants provided the public with an estimate concerning its revenue and backlog for the fourth quarter, which by that point in time, was almost halfway complete. Defendant Hooper stated, "As we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability." Burns still spoke on the call, despite resigning less than an hour earlier, and announced that, based on large deferred service revenue and healthy product backlog, defendants estimated fourth quarter revenue to be "in the range of $91 million to $93 million." Further, Defendant Hooper attempted to gloss over Defendant Burns' abrupt resignation as due to Burns wanting to pursue other career opportunities. However, these statements were a gross mischaracterization of the state of the business.

33.   Gigamon's leadership was in a state of chaos. Many saw Defendant Burns' departure as a sign of troubled times at Gigamon. JMP analysts specifically stressed Defendant Burns' departure as one of three key takeaways from the call, "The Company announced its CFO, Mike Burns, is leaving Gigamon after having been with the Company for just over two years. Mr. Burns' successor will be Rex Jackson, who joined Gigamon from the struggling advertising technology developer Rocket Fuel and will be the third CFO at Gigamon since its IPO in mid-2013. We are disappointed to see Mr. Burns' departure as we feel the Company needs greater continuity in the CFO position, given the Company's limited history as a public company and its volatile stock performance."

34.   Later, at the December 6, 2016 Raymond James Technology Investors Conference, Defendant Hooper then changed the story explaining the CFO's departure. At the

Raymond James Technology Investors Conference, an analyst asked about Defendant Hooper's

thoughts on the CFO transition. Hooper then said,

> So I'll take the first. So Mike Burns had been with us for two something years,
> coming up on three years. He joined us in the middle of 2014 and joined us at a
> time when the Company had suffered unfortunate capital misses with our first half
> of 2014, and he came in and stabilized and introduced the right processes, the right
> systems, and then led us on a sequential path of beating raises.
>
> And so when we -- when Mike and I started speaking here, what, five months, four
> months ago now, we started talking about the future and how we're going to
> continue to scale and increase the business. Michael was pretty candid. He'd had a
> very good run. He had enjoyed the time at Gigamon. He was an empty nester. He
> and his wife were looking to travel and he had done very well at Gigamon. So he
> was -- it was kind of a mutual decision that he was going to take some time off, go
> and do some -- a lot of traveling with his wife, and that's when we started searching
> for a CFO and that's when Rex joined us now -- how many months ago was that?

35.     Many former employees were surprised and concerned at Burns' sudden

announcement, particularly because they viewed him as one of the few sources of stability at

Gigamon. Former Gigamon Sales Operations Specialist from March 2014 to June 2016, CW 1,

stated that Defendant Burns' departure was probably related to the influence of Helmut Wilke,

Senior Vice President of Worldwide Sales, on the Company culture and new rules in the office.

Meanwhile, former Gigamon Regional Sales Director from January 2015 until August 2016, CW

2, recalled Burns as being a great guy and indicated that something must have happened because

"everyone was shocked" at Burns' departure. CW 2 also reported that he sold all of his Gigamon

stock once he found out that Burns was no longer with the Company and project that the Company

was going to go downhill fast.

36.     Former employees reported that since Helmut Wilke, Senior Vice President of

Worldwide Sales, was appointed in August 2014, there was increased discord and abrupt

employee terminations within Gigamon. CW 1 explained that when the Company brought in

Helmut Wilke, it was "Follow the new rules or you're out."

37.     CW 1 reported that current Manager of Renewals and Orders at Gigamon, Rich

Garno was an ex-Sheriff who came into the Company and started to play favoritism within the

11

1   sales unit. CW 1 questioned those tactics and brought up her concerns during a company meeting.

2   She was quickly "Written-up for 45 days," she said. When CW 1 returned to work after 40 days,

3   her purse and personal items were taken from her desk and she was escorted out of company

4   offices. That was CW 1's last day at Gigamon. CW 1 said Garno was the individual who made

5   that decision. These types of departures started to happen a lot around that time, she added. CW

6   1 was not certain of all of the contributing factors, but "People would hear a grumble [from an

7   employee] and then they were gone [fired]."

8       38.     Many employees reported that internal procedures for estimating sales goals or

9   revenue numbers were vague, overly bullish, and often had no basis in reason or reality.

10      39.     CW 2 also reinforced that Gigamon had questionable forecasting practices. Many

11  "hard working" employees left disgruntled and "I saw the writing on the wall" and left the

12  Company, he said. In addressing management issues, CW 2 said, "[Deardurff] had an interesting

13  way of managing and coming up with numbers." CW 2 was referring to Chris Deardurff, the

14  current VP of Sales, North America at Gigamon. CW 2 said that ego replaced realism at Gigamon.

15  When Deardurff joined the Company, employees were asked to provide 12 times more than their

16  quotas. CW 2 recalled that his former boss, Derek Donahue, had a $35 million quota that was not

17  being met, and the new appointed supervisor was expected to meet 5 times that quota. He added,

18  "North America alone doesn't have that amount [of revenue/quota]." Deardurff joined the

19  Company soon after and everything changed for the worst. The numbers became unrealistic, CW

20  2 explained. He recalled some statistical theory or formula that explained how the numbers were

21  realistic or manageable, but the bottom line was that, in practice, the new quotas were impossible

22  to achieve and employees ultimately left. If employees protested, "They were out the door," he

23  added. CW 2 had no additional information about the "theory," he just recalled something similar

24  to a theory that explained how it would work, but it ultimately did not work. CW 2 reported that

25  Deardurff kept increasing sales targets and increased meeting requirements. Jokingly making the

26  point that the expectations were not reasonable, CW 2 said, "15 meetings a week? I have no time

27

28

LEAD PLAINTIFFS' AMENDED COMPLAINT
No. 5:17-cv-00434-EJD

1  for prospecting, how does that work?" He stated, "These guys sell [Deardurff and other

2  management] themselves but at some point the curtain is going to come down."

3      40.     Former Sales Director for Gigamon from June 2014 until June 2016, CW 3,

4  discussed financials at Gigamon and said, "When Hooper says, 'the next [financial] Quarter will

5  be xyz [some projected figure], that's based on him, the CFO and the VP of Sales [and information

6  they put together]." According to CW 3, all the forecasts are "rolled up" based on individual

7  territories, but based on "black magic" sometimes. He said, "If too many dominoes fall when they

8  shouldn't there could be a big problem."

9      41.     CW 4, a former Regional Sales Director for Gigamon from September 2015 until

10 January 2017, also addressed the Company's ambition and unrealistic expectations. CW 4 opined

11 that the Company might have been too arrogant concerning "the numbers" at the end of the

12 quarter. He described company management as having an "entitlement" that justified their

13 projected numbers. The Company likely held to a "number that they shouldn't have," explained

14 CW 4. The Company terminated the EVP of Sales and various North America Sales personnel,

15 he explained. He added, "Why?"

16     42.     CW 5, a former Regional Sales Director for Gigamon from February 2017 until

17 July 2017, also reported concerns with leadership and unrealistic sales contract expectations. CW

18 5 was heavily recruited by Gigamon and left Cisco, only to be terminated in a quarter's time. CW

19 5 believes that Gigamon had immature leadership and did not have a good grasp of their industry,

20 particularly related to SLED (State, Local, & Education) contracts. He explained, "Nobody hires

21 a government team and sacks them in a quarter." CW 5 added, "They [Executive Management]

22 didn't even know what they weren't doing, no conscious." CW 5 used Paul Hooper as an example.

23 Hooper was never a CEO before and now he runs the Company, CW 5 explained. According to

24 CW 5, the Company lacked congruency with respect to government contracts. CW 5 explained

25 that Gigamon failed to assemble the SLED team at least two times before he joined the Company.

26 Gigamon also failed to disclose that information to CW 5 during the recruitment process. CW 5

27

28

1    "knew the gig was up [with the SLED Team]" when he received a phone call from Hooper to

2    discuss the lack of contracts. CW 5 explained to Hooper that there were never any contracts in

3    place at the government level. Government contracts take time. CW 5 joked, "Maybe I sold him

4    on that idea," because shortly afterwards, the sales team was terminated. According to CW 5, it

5    was incredulous and poor planning. CW 5 explained to Hooper that there were never any contracts

6    in place at the government level. Government contracts take time. CW 5 joked, "Maybe I sold

7    him on that idea," because shortly afterwards, the sales team was terminated. It was incredulous

8    and poor planning, explained CW 5.

9        43.    CW 5 also recalled that Gigamon was looking to sell the Company around the

10   same time that it recruited and hired a government sales team. Perhaps Gigamon wanted to check

11   some boxes to make the Company appear "shinier," he said. He explained that Gigamon kept Ted

12   Parken, the Senior Director of State/Local and Education Sales, but laid off the rest of his team.

13   He said the Company can still possibly check that box, since they have a department Head. Parken

14   ended up becoming more of a "glorified administrator" to possibly assist the Company's agenda,

15   according to CW 5. He also noted that it is possible that C-Suite Executives were attempting to

16   put more money in their pockets.

17       44.    Despite these numerous failures in forecasting, which often involved 'black

18   magic,' and were more the product of Hooper's optimism than any basis in reality, Defendant

19   Hooper and Gigamon repeatedly and aggressively made extremely overly-optimistic comments

20   about the state of Gigamon's financials and company outlook. Prior to and during the Class

21   Period, Defendant Hooper emphasized Gigamon's strong growth:

22   •     On September 23, 2016, in an interview with The Wall Street Transcript,
           Hooper emphasized that Gigamon's North America segment "is growing at
23         a rate of 40% to 50% year over year," that Gigamon is a "fast growing
           company" with "45% year-over-year growth," and that Gigamon showed
24         growth of "41% last year and 45% last quarter [third quarter]";

25   •     On November 2, 2016, in an interview with Needham & Company, Hooper
26         stated that Gigamon's "[g]rowth . . . is impressive" and that "[o]ver the last
           four years, it's been 32% CAGR," "[o]ver the last year, 2014 going into

27

28

2015, it is 41%," "[o]ver the first nine months of this quarter [sic], wer are now at 46%," and that "[e]very quarter, we are accelerating";

- During the November 2, 2016 interview with Needham & Company, Hooper claimed that Gigamon was "a 55% growth Company hidden in a 47% skin"; and

- On November 30, 2016, during an interview with Credit Suisse, Hooper emphasized Gigamon's performance over the year, stating that "[l]ast year we grew at 41%. Last quarter we grew at 47%, against a market that is independently assessed at growing at 25%. And if we look ahead, the market growth rates remain the same at 25%, and I think consensus has it at 25% year-over-year growth. We have repeatedly outperformed consensus, repetitively outperformed the market."

45. The fact that Defendants vastly overstated revenue is reinforced by the facts that only one of their top twenty-five customers completely deferred for the fourth quarter, and yet, as William Blair analysts noted, the healthy backlog was severely depleted to a mere $3.1 million, compared to prior year-end backlogs of $8.4 million in 2015 and $12.2 million in 2014. This shows that Defendants had to pull from and force sales that were supposed to take place in the first quarter of 2017 into the last quarter of 2016 to account for Defendants' extreme overestimate. And yet, despite these efforts to pull sales from 2017, Defendants still fell short of estimates by over $6 million. Defendant Hooper participated in at least three conference calls with analysts, and Jackson participated in at least two conference calls with analysts, yet neither made any attempt to correct the significantly overestimated quarterly revenue and backlog. Gigamon published five press releases during the class period, each time failing to address the overestimated revenue.

## C.   Defendants Made Materially False and/or Misleading Statements

46. On October 27, 2016, the Company held a conference call at 5:00 p.m. EST (the "3Q16 Conference Call") with investors and analysts to discuss the Company's third quarter 2016 financial results. Defendants Hooper and Burns attended the call on behalf of Gigamon. During the call, Defendants provided investors with a materially misleading description of the Company's revenue for the fourth quarter. In pertinent part, Defendants provided the public with an estimate concerning its revenue for the fourth quarter, which by that point in time, was almost

halfway complete. Defendant Hooper stated, "As we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability." Based on large deferred service revenue and healthy product backlog, Defendants estimated fourth quarter revenue to be "in the range of $91 million to $93 million."

47.     Defendant Burns stated, in pertinent part, as follows during the call:

Now for our Q4 outlook. We're excited to provide the following guidance, using our same disciplined guidance methodology for our fiscal fourth quarter ending December 31, 2016. It's based on non-GAAP results and excludes any stock-based compensation and related expenses. Our large deferred service, healthy product backlog, and consistent quarterly linearity continue to provide good visibility on growth, profits and execution. ***We expect fourth quarter revenue in the range of $91 million to $93 million***, 37% year-over-year growth at the midpoint. As we continue to execute on the profit drivers in all aspects of our business, we are confident that we will sustain gross margins at approximately the range of 82% to 83%. We continue to believe that now is a great time for us to invest in our business. We are investing with conviction to expand our security portfolio, deliver next generation technology, and increase sales capacity to ensure continued strong growth next year.

In the fourth quarter of 2016 we also expect to accrue accelerated year-end commissions due to our strong performance throughout the year. As a result, we are forecasting fourth-quarter operating expenses in the range of $54.5 million to $55.5 million. We expect to book a 32% non-GAAP tax provision, and with the diluted share count of approximately 39 million, we expect to deliver non-GAAP earnings per share in the range of $0.36 to $0.38. Achieving the midpoint of our fourth-quarter guidance will bring our 2016 annual revenue growth to 43%, our second consecutive year of accelerating revenue growth. We would deliver annual EPS growth of 56% and would result in annual gross margin above 82% and annual operating margin of 22%.

In summary, the third quarter was another great quarter of execution and we are well-positioned for a strong finish to the year. We continue to see significant demand for our solutions across all of our verticals and plan to next update you on our progress during our fourth-quarter and full-year 2016 conference call preliminarily scheduled for Thursday, February 2, 2017.

(emphasis added)

48.     Defendants' Hooper's and Burns' statements (in particular, the revenue guidance identified in bold and italics above) falsely led investors to believe that the Company had

significant unrecognized revenue, that there were product bookings in the backlog which would significantly increase revenue, and that, overall, increased revenue was guaranteed. In reality, as would be disclosed later, Burns' statements concerning the Company's revenue were neither meaningful nor accurate, and should not have been relied upon.  Further, by promoting the Company's supposed "good visibility on growth, profits and execution" while omitting the truth concerning the Company's true potential revenue, Burns materially misled investors into believing that increased revenue was guaranteed and imminent.

49.     Analyst reports concerning the Company's fourth quarter 2016 financial guidance confirm that the above statements were material to investors. JMP analysts began their October 28, 2016 report with, "We maintain our Market Perform rating after Gigamon reported 3Q16 EPS of $0.36 (JMP $0.30; consensus $0.31) on revenues of $84M (JMP $79M; consensus $80M) and *guided to 4Q16 EPS of $0.36-0.38 (JMP/consensus $0.33) on revenues of $91-93M (JMP/consensus $86M), leading the shares to trade up 9% in the aftermarket*" (emphasis added).

50.     Analysts from William Blair noted in their October 28, 2016 report, "Fourth-quarter revenue was guided roughly $6 million above consensus at the midpoint, which implies 37% year-over-year growth at the midpoint. Non-GAAP EPS were guided above consensus by roughly $0.04, which implies operating margin of roughly 22.7% . . ." William Blair analysts also noted, "Management specifically noted that strength in U.S. federal enabled the Company to build healthy enterprise backlog, which we believe underpins the strong fourth-quarter outlook."

51.     Credit Suisse analysts also made note of Defendants' statements, and raised their target price from $50.00 to $57.00 while Rosenblatt analysts continued to rate Gigamon shares a Buy and raised their target price to $60.

52.     Defendants Hooper's and Burns' statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell

Gigamon stock.  Gigamon's stock price increased from $47.38 per share on October 27, 2016 to $55.01 per share on October 28, 2016.  Defendants Hooper's and Burns' statements on October 27, 2016 prompted a 25% increase in Gigamon's stock price on heavier than normal trading volume.

**D.**     **The Truth Begins to Emerge**

53.     On January 17, 2017, the Company issued a press release entitled "Gigamon Announces Preliminary Fourth Quarter and Fiscal Year 2016 Results." Therein, the Company disclosed:

> Santa Clara, CA - January 17, 2017 - Gigamon (NYSE: GIMO), the industry leader in traffic visibility solutions, today announced preliminary results for the fourth quarter and fiscal year ended December 31, 2016.
>
> Gigamon currently expects:
>
> Fiscal Fourth Quarter 2016 Preliminary Results
>
> - ***Revenue of $84.5 million to $85.0 million, compared to the Company's prior guidance of $91 million to $93 million.***
> - GAAP gross margin between 83 percent and 84 percent.
> - Non-GAAP gross margin between 83 percent and 84 percent, compared to the Company's prior guidance of 82 percent to 83 percent.
> - GAAP earnings per share of $0.18 to $0.20.
> - Non-GAAP earnings per share of $0.35 to $0.37 compared to the Company's prior guidance of $0.36 to $0.38.
>
> Fiscal Year 2016 Preliminary Results
>
> - ***Revenue of $310.3 million to $310.8 million, an increase of approximately 40 percent year-over-year.***
> - GAAP gross margin between 81 percent and 82 percent, at the fourth quarter midpoint an approximate 280 basis point improvement year-over-year.
> - Non-GAAP gross margin between 82 percent and 83 percent, at the fourth quarter midpoint an approximate 250 basis point improvement year-over-year.
> - GAAP operating margin between 9 percent and 10 percent, at the fourth quarter midpoint an approximate 440 basis point expansion year-over-year.

- Non-GAAP operating margin between 22 percent and 23 percent, at the fourth quarter midpoint an approximate 340 basis point expansion year-over-year.
- GAAP earnings per share of $1.32 to $1.34, at the fourth quarter midpoint an approximate 680 percent year-over-year increase.
- Non-GAAP earnings per share of $1.22 to $1.25, at the fourth quarter midpoint an approximate 50 percent year-over-year increase.

"We are disappointed our fourth quarter revenue was below our prior guidance, but we are pleased with our overall financial performance in 2016, our second consecutive year of 40 percent year-over-year revenue growth," said Paul Hooper, CEO of Gigamon. "Fourth quarter revenue fell short primarily due to lower than expected product bookings in our North America West region, as several significant existing customer accounts deferred purchasing decisions into 2017."

(emphasis added)

54.   The market reacted sharply to this news.  The price of Gigamon common stock fell $12.65 per share, or 28.7%, to close at $31.40 per share on January 18, 2017, on unusually heavy trading volume.

55.   Analysts Credit Suisse, Doughterty & Company, JMP, Rosenblatt, and William Blair all released reports ahead of the scheduled February 2, 2017 Fourth Quarter and Fiscal Year 2016 Results Report in response to the January 17 revelations. William Blair analysts reported that the after-hours price of Gigamon dropped to $34.45, and that "Management attributed the disappointing results to lower-than-expected product bookings in the North America West region, as several significant existing customer accounts deferred purchasing decisions into 2017. We believe this included several large high-tech enterprise accounts in Silicon Valley as well as a large mobile service provider based in Seattle." Investors also responded negatively to the news. JMP stated, "[T]he Company preannounced F4Q16 EPS of $0.35-0.37 on revenues of $84.5-85.0M, falling short of the consensus and our estimate for EPS of $0.37 on revenues of $92M, leading the stock to trade down ~22% in the aftermarket."

56.   On February 2, 2017, the Company hosted a conference call to discuss its fourth quarter and year-end financial results. Defendant Hooper and Chief Financial Officer Rex Jackson participated in the call on behalf of Gigamon. During the call, Defendant Hooper stated:

As we reported in our preliminary release, *Q4 revenue is $85 million, below our guidance and primarily due to lower than expected bookings in our North America west region, as several significant larger accounts deferred purchasing decisions into 2017.*

We understand that the reasons for the deferrals range from changes in their purchasing patterns to network upgrade decisions that we believe are unrelated to our customer's commitments to add solutions. These customers are frequent purchasers of our solutions, have large existing installations that they continue to extend and have a number of future projects contemplated in 2017. While we see a few competitors increasing their attention on this fast growth market, we do not believe our win rates in Q4 or 2016 declined from historical levels.

. . .

*Although lower than expectations, Q4 revenue remained above market, up 27% year-over-year with notable growth in EMEA.*

. . .

Over the course of the year, we have seen new customers for our mobility solutions in all geographies and while mobile carriers can create significant lumpiness in a business, as it rapidly develops, they represent long-term and valuable customs.

Jackson went on to state:

As Paul stated, that *we did not hit our revenue guidance*, Q4 was a strong quarter for Gigamon.

. . .

Product bookings were lower than expected leading to revenue mix, but renewals were excellent in Q4, increasing our deferred revenue balance $14.6, $9.3 million of which will be recognized over 12 month term and the balance representing longer term commitments from our customers.

. . .

*Healthy product backlog at quarter end was $3.1 below our range of approximately $6 million to $8.5 million of proceeding six quarters.*

. . .

As you may recall, first quarter of 2016 had an [indiscernible] from service revenue in approximately $10 million customer. As in Q4, we do not expect any particularly large bookings in Q1 and thus again expect backfill from a large and healthy distribution of customers to be deemed with and slightly ahead of Q1 '16.

(emphasis added)

57.    These disclosures confirmed the $6 million to $8 million overestimate for revenue along with the 10% shortfall in year-over-year growth. They also revealed that product backlog was significantly lower than what would be expected from the October 2016 misrepresentations. The market again reacted as it digested the confirmation of the misrepresentations. On February 3, 2017, the stock price further fell from $32.10 to $30.40, a decline of an addition 5.3%, on unusually high trading.

58.    Analysts from Rosenblatt Securities Inc. stated in the February 3, 2017 report, "Clearly we expect GIMO shares to be in the "penalty box" for a while as the Company works to restore trust with investors and show the Street that it has dealt successfully with the operational issues that impacted Q4."

59.    Analysts from William Blair were not as kind, noting the after-hours stock trading price of roughly $27, and writing,

Gigamon's fourth quarter was every bit as bad as its first three quarters of the year were good. **Reported fourth-quarter revenue of $85 million missed initial revenue guidance by 8%, but this actually understates how bad the shortfall really was; end-of-year backlog was almost nonexistent, suggesting that the Company pulled business from the first quarter.** The obvious question is how can a company humming along so nicely for two years hit a brick wall so abruptly? First off, we do not see the miss as reflecting a structural change in Gigamon's end-markets, either from a demand or competitive standpoint. It is hard to believe that the need for pervasive visibility in service provider, federal, and enterprise networks changed overnight, and Gigamon remains the clear market leader in visibility fabrics.

. . .

Overall, the picture is of a company that was experiencing a concentrated surge of business over multiple quarters (a positive perfect storm), but somewhere along the way became overconfident and lost track of its business.

. . .

Gigamon reported a weak fiscal fourth quarter, in line with its January 17 prerelease, missing prior guidance by $7 million on revenue and guiding fiscal first quarter significantly below Street consensus on top and bottom lines. Fourth quarter revenue grew 27% year-over-year (lowest level in eight quarters) and 2% sequentially. Backlog of $3.1 million was very weak, suggesting that the Company pulled business from the first quarter. Backlog in the year-ago quarter was $12 million and the normal range over the last six quarters has been $6 million to $8.5 million.

. . .

Management attributed the 8% revenue miss largely to lower-than-expected product bookings in the North America West region, as several significant existing customer accounts deferred purchasing decisions into 2017 (even though 24 of the top 25 customers continued to purchase in the fourth quarter).

(emphasis added)

60.     As demonstrated by the above analyst report, Analysts and investors alike perceived Defendants' statements as revelatory in

**E.     Defendants Acted With Scienter**

61.     Defendants acted with scienter when making the material misrepresentations discussed above. Defendants knew that the estimate of $91 million to $93 million was materially misleading because it was inaccurate at the time it was made or, alternatively, Defendants acted with deliberate recklessness when making the statement by disregarding the risk that the statement would mislead investors.

62.     Hooper's statements during the Needham & Company interview on November 2, 2016 show that Defendants knew that the October 27, 2016 revenue projection was materially inaccurate. On November 2, 2016, only five days after Defendants' misstatements, in an interview with an analyst from Needham & Company, Hooper stated that he estimated that annual revenue would be "around . . . $315 million." As of September 30, 2016, Gigamon had already earned $225,826,000 in revenue. Accordingly, Hooper's November 2, 2016 estimate revealed that

Gigamon believed internally that its revenue for the fourth quarter would be $89 million, which was materially less than the forecast of $91 million to $93 million stated just five days earlier.

63.     The fact that Defendants knew that the October 27, 2016 revenue estimate was materially inaccurate at the time it was made confirm that Defendants acted with scienter. While Burns made the statement, he made it on behalf of Gigamon. Hooper, for his part, had advance notice of the statement and approved it (being that it was integral to Defendants' opening statements and script during the conference call). The knowledge of Hooper and Burns is imputed to Gigamon. Accordingly, Defendants acted with scienter when they provided the revenue estimate on October 27, 2016.

64.     Further supporting the conclusion that Defendants acted with scienter is the fact that Hooper, Burns, and a number of other high-level Gigamon insiders profited from selling Gigamon stock while the price of the stock was artificially inflated.

65.     Four days after Defendants' misrepresentation, Defendant Hooper sold 45,000 Gigamon shares at between $53 per share and $55 per share. While this sale was purportedly due to a Rule 10b5-1 trading plan adopted by him on May 19, 2015, this was his highest single-day stock sale to date, bringing in a total of $2,442,388.90. The sale represented approximately 25% of Hooper's Gigamon stock.

66.     On November 15, 2016, Defendant Hooper sold an additional 7,222 shares at the inflated price of $57.45. Although this sale was purportedly to cover the his tax liability in connection with the vesting of restricted stock units, the misrepresentations created an artificial inflation allowing Defendant Hooper to reap an additional $414,903.90 and sell less shares than he otherwise would have had the stock price not been inflated.

67.     During the class period, Hooper sold a total of 52,222 shares of Gigamon stock, reaping a total of $2,857,340.01. These sales were atypical in terms of timing and amounts and, therefore, demonstrate motive on the part of Hooper to benefit financially from Defendants' fraudulent statements.

68.     Burns likewise sold stock at atypical times and in atypical amounts. Prior to the class period, Burns had sold Gigamon at regular intervals, almost monthly, in amounts that generally coincided with the vesting of option shares. Burns' last Form 4, filed September 23, 2016 listed him as owning 78,705 shares. However, according to Gigamon's most recent proxy statement, Burns owns 58,686 shares as of April 30, 2017. Based on this information, Burns has sold at least 20,019 shares since stepping down as Chief Financial Officer, which, if sold during the stock's high during the class period ($60.35), he would have received $1,208,146.65. (It is unclear if Burns has exercised any of his remaining stock options, which total 45,509 shares, as reported on his last Form 4. If he has, then Burns would have sold more than 20,019 shares in the months following his resignation.)

69.     During the class period, Shehzad Merchant, Chief Technology Officer, sold a total of 37,935 shares of Gigamon stock, reaping a total of $2,166,064.06.

70.     During the class period, Ted Ho, a Director, sold a total of 180,000 shares of Gigamon stock, reaping a total of $8,731,310.49.

71.     During the class period, Helmut Wilke, Sr. VP Worldwide Sales, sold a total of 8,032 share of Gigamon stock, reaping a total of $462,573.40.

72.     During the class period, Paul Shinn, Secretary and General Counsel, sold a total of 5,064 share of Gigamon stock, reaping a total of $293,972.00.

73.     Defendants and other officers and directors benefitted financially from the inflated stock price caused by Defendants' misrepresentations. Defendants' actions and statements give rise to a strong inference that their statements concerning the status of the Company's financials were made with scienter.

**F.     Defendants' Misrepresentations and Omissions Directly Caused Plaintiff's Losses**

74.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Gigamon's securities which operated as a fraud or deceit on Class Period

purchasers of Gigamon's stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the trading price of Gigamon's securities fell precipitously, as the prior artificial inflation came out of the price over time.

75.     Specifically, Defendants misrepresented that: (a) the Company had large deferred service revenue which would be recognized in the fourth quarter of 2016; (b) the Company had a "healthy product backlog," and thus ample customers and work; (c) "consistent quarterly linearity"; and (d), as a result of these factors, could and would generate between $91 million and $93 million in revenue for the fourth quarter of fiscal 2016.

76.     On January 17, 2017 and February 2, 2017, Defendants revealed that Gigamon would not meet these revenue estimates and, in fact, that the Company's backlog was insufficient to compensate the revenue shortfall that occurred in the fourth quarter. As a result of these corrective disclosures, the trading price of Gigamon's securities declined significantly (as detailed above).

77.     As a result of their purchases of Gigamon's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

78.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the securities of Gigamon during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

79.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Gigamon's common stock was actively traded on

1   NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and

2   can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at

3   least tens of thousands of members in the proposed Class.  Members of the Class may be identified

4   from records maintained by Gigamon or its transfer agent and may be notified of the pendency of

5   this action by mail, using a form of notice customarily used in securities class actions.

6        80.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all

7   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

8   federal law that is complained of herein.

9        81.     Lead Plaintiffs will fairly and adequately protect the interests of the members of

10  the Class and have retained counsel competent and experienced in class and securities litigation.

11       82.     Common questions of law and fact exist as to all members of the Class and

12  predominate over any questions solely affecting individual members of the Class. Among the

13  questions of law and fact common to the Class are:

14       (a)     Whether the federal securities laws were violated by Defendants' acts as alleged

15               herein;

16       (b)     Whether the misstatements and omissions alleged herein were made with scienter;

17       (c)     Whether the statements made by Defendants to the investing public during the

18               Class Period misrepresented material facts about the business and operations of

19               Gigamon; and

20       (d)     To what extent the members of the Class have sustained damages, and the proper

21               measure of damages.

22       83.     A class action is superior to all other available methods for the fair and efficient

23  adjudication of this controversy since joinder of all member is impracticable.  Furthermore, as the

24  damages suffered by individual Class members may be relatively small, the expense and burden

25  of individual litigation make it impossible for members of the Class to redress individually the

26

27

28

1    wrongs done to them.  There will be no difficulty in the management of this action as a class

2    action.

3                    **PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

4            84.    At all relevant times, the market for Gigamon's common stock was an efficient

5    market for the following reasons, among others:

6            (a)    Gigamon's common stock met the requirements for listing and was listed and actively

7                    traded on the New York Stock Exchange, a highly efficient and automated market;

8            (b)    Gigamon communicated with public investors via established market communication

9                    mechanisms, including disseminations of press releases on the national circuits of

10                   major newswire services and other wide-ranging public disclosures, such as

11                   communications with the financial press and other similar reporting services;

12           (c)    Gigamon was followed by several securities analysts employed by major brokerage

13                   firms who wrote reports that were distributed to the sales force and certain customers

14                   of their respective brokerage firms during the Class Period.  Each of these reports was

15                   publicly available and entered the public marketplace;  and

16           (d)    Unexpected material news about Gigamon was reflected in and incorporated into the

17                   Company's stock price during the Class Period.

18           85.    As a result of the foregoing, the market for Gigamon's securities promptly digested

19   current information regarding Gigamon from all publicly available sources and reflected such

20   information in Gigamon's stock price.  Under these circumstances, all purchasers of Gigamon's

21   securities during the Class Period suffered similar injury through their purchase of Gigamon's

22   securities at artificially inflated prices, and a presumption of reliance applies.

23           86.    Alternatively, reliance need not be proven in this action because the action

24   involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to

25   recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah*

26   *v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material

27

28

in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

87.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

88.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

89.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Gigamon who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**COUNT I**

(*Violation of Section 10(b) and Rule 10b-5 Against Hooper, Burns, and Gigamon*)

90.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

91.     During the Class Period, Defendants Hooper, Burns, and Gigamon carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:

1    (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein;

2    and (2) cause Plaintiffs and other members of the Class to purchase Gigamon's securities at

3    artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct,

4    Hooper, Burns, and Gigamon took the actions set forth herein.

5    92.    Defendants Hooper, Burns, and Gigamon: (a) employed devices, schemes, and

6    artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material

7    facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a

8    course of business that operated as a fraud and deceit upon the purchasers of the Company's

9    securities in an effort to maintain artificially high market prices for Gigamon's securities in

10   violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Hooper,

11   Burns, and Gigamon are sued either as primary participants in the wrongful and illegal conduct

12   charged herein or as controlling persons as alleged below.

13   93.    Defendants Hooper, Burns, and Gigamon, individually and in concert, directly and

14   indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

15   engaged and participated in a continuous course of conduct to conceal adverse material

16   information about the business, operations and future prospects of Gigamon as specified herein.

17   94.    Hooper, Burns, and Gigamon employed devices, schemes, and artifices to defraud

18   while in possession of material adverse non-public information, and engaged in acts, practices,

19   and a course of conduct as alleged herein in an effort to assure investors of Gigamon's value and

20   performance and continued substantial growth, which included the making of, or participation in

21   the making of, untrue statements of material facts and omitting to state material facts necessary

22   in order to make the statements made about Gigamon and its business operations and future

23   prospects in the light of the circumstances under which they were made, not misleading, as set

24   forth more particularly herein, and engaged in transactions, practices and a course of business that

25   operated as a fraud and deceit upon the purchasers of Gigamon's securities during the Class

26   Period.

27

28

95.     Defendants Hooper, Burns, and Gigamon had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Hooper's, Burns', and Gigamon's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Gigamon's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Hooper's, Burns', and Gigamon's overstatements and misstatements of the Company's financial condition throughout the Class Period, Hooper, Burns, and Gigamon, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Gigamon's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Gigamon's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Hooper, Burns, and Gigamon, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Hooper, Burns, and Gigamon but not disclosed in public statements by Hooper, Burns, and Gigamon during the Class Period, Plaintiffs and the other members of the Class acquired Gigamon's securities during the Class Period at artificially high prices and were or will be damaged thereby.

97.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Gigamon's financial results, which was not disclosed by Hooper, Burns, and Gigamon, Plaintiffs and other members

of the Class would not have purchased or otherwise acquired their Gigamon's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

98.     By virtue of the foregoing, Hooper, Burns, and Gigamon have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

99.     As a direct and proximate result of Hooper's, Burns' and Gigamon's wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

100.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### (*Violation of Section 20(a) Against Hooper and Burns*)

101.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

102.     Hooper and Burns acted as controlling persons of Gigamon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements made in the conference call and disseminated to the investing public, Hooper, and Burns had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Hooper and Burns were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

103.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

104.   Hooper and Burns either drafted or had control over the drafting of the press releases and conference call scripts that contained the material misrepresentations in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

105.   As set forth above, Gigamon violated Section 10(b), and Rule 10b-5 promulgated thereunder, by its acts and omissions as alleged in this Complaint.

106.   By virtue of their positions as controlling persons, Hooper and Burns are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Hooper's and Burns' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

107.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

1    (d)    Such other and further relief as the Court may deem just and proper.

2                          **JURY TRIAL DEMANDED**

3    Lead Plaintiffs hereby demand a trial by jury.

4    Dated:  September 22, 2017          Respectfully submitted,

5

6                                  **LEVI & KORSINSKY, LLP**

7
                                   /s/ Adam C. McCall
8                                  Adam C. McCall (SBN 302130)
                                   445 South Figueroa Street, 31st Floor
9                                  Los Angeles, A 90071
                                   Tel: (213) 985-7290
10

11                                         -and-

12
                                   Nicholas I. Porritt (*to be admitted pro hac vice*)
13                                 Adam M. Apton (*to be admitted pro hac vice*)
                                   Michelle Gruesbeck (*to be admitted pro hac vice*)
14                                 **LEVI & KORSINSKY, LLP**
                                   1101 30th Street N.W., Suite 115
15                                 Washington, D.C. 20003
                                   Tel: (202) 524-4290
16

17
                                   *Attorneys for Lead Plaintiffs Sharyn McGowan, Kreling &*
18                                 *Company I401k Plan, Matthew Kreling, and Ricardo*
                                   *Salias and Lead Counsel for the Class*
19

20

21

22

23

24

25

26

27                                          33
                          LEAD PLAINTIFFS' AMENDED COMPLAINT
28                             No. 5:17-cv-00434-EJD