JEROME F. BIRN, JR., State Bar No. 128561
jbirn@wsgr.com
CAZ HASHEMI, State Bar No. 210239
chashemi@wsgr.com
JESSICA L. SNORGRASS, State Bar No. 259962
jsnorgrass@wsgr.com
NICHOLAS R. MILLER, State Bar No. 274243
nmiller@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

*Attorneys for Defendants Gigamon Inc., Paul A. Hooper and Michael J. Burns*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH RODRIGUEZ, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GIGAMON INC., PAUL A. HOOPER, and MICHAEL J. BURNS,<br><br>Defendants. | CASE NO.: 5:17-cv-00434-EJD<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: March 1, 2018<br>Time: 9:00 a.m.<br>Dept: Courtroom 4, 5th Floor<br>Before: Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**


NOTICE OF MOTION AND MOTION ..... 1

STATEMENT OF ISSUES TO BE DECIDED ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 3

A. Defendants ..... 3

B. For Nine Consecutive Quarters Before the Class Period, Gigamon Exceeded Its Quarterly Guidance. ..... 3

C. On October 27, 2016, Gigamon Provided Q4 2016 Guidance. ..... 4

D. On January 17, 2017, Gigamon Pre-Announced That It Would Miss Its Q4 2016 Revenue Guidance by 7.6%. ..... 5

E. Summary of Plaintiffs' Allegations. ..... 5

ARGUMENT ..... 6

I. LEGAL STANDARD ..... 6

II. PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE FALSE STATEMENT ..... 7

A. The Challenged Statements Are Forward-Looking and Protected by the PSLRA's Safe Harbor. ..... 7

1. The Challenged Statements Are Forward-Looking and Were So Identified. ..... 8

2. Gigamon Identified Important Risk Factors That Could Cause Actual Results To Vary. ..... 10

B. Vague Statements of Corporate Optimism Are Not Actionable. ..... 12

C. Plaintiffs Fail To Allege Particular Facts Showing That Any Alleged Misstatement Was False or Misleading When Made. ..... 12

1. The Fact That Guidance Was Not Achieved Does Not Establish Falsity. ..... 13

2. The CW Allegations Fall Far Short of Showing That the Challenged Statements Were False or Misleading. ..... 13

a. CW1 ..... 14

b. CW2 ..... 14

c. CW3 ... 15

d. CW4 ... 16

e. CW5 ... 16

3. The Miscellaneous Statements To Analysts Are Not Actionable. ... 17

III. PLAINTIFFS FAIL TO ALLEGE FACTS TO SUPPORT A STRONG INFERENCE OF SCIENTER ... 18

A. Mr. Hooper's November 2 Statement Does Not Suggest Scienter. ... 19

B. Plaintiffs' Stock Sale Allegations Do Not Support An Inference of Scienter. ... 19

a. Mr. Hooper ... 20

b. Mr. Burns ... 21

c. Non-Defendants ... 21

C. Whether Viewed Individually or Holistically, There Is No Compelling Inference of Scienter. ... 22

IV. CONCLUSION ... 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bao v. Solarcity Corp.*, No. 14-CV-01435-BLF, 2016 WL 54133 (N.D. Cal. Jan. 5, 2016)................................. 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................................ 6

*Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912 (N.D. Cal. 2017) ................................................................... 11

*Browning v. Amyris, Inc.*, No. 13-CV-02209-WHO, 2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)........................ 21

*Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344 (N.D. Cal. Mar. 2, 2012)........................................ 11

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017)............................................................................................................ 21

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................... 7, 8

*Emp'r Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125 (9th Cir. 2004)............................................................................. 12

*Fadia v. FireEye, Inc.*, No. 5:14-CV-05204-EJD, 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) (Davila, J.) ........................................................................................... 12, 20

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, No. CV-1507952-CASR-AOX, 2017 WL 114401 (C.D. Cal. Jan. 9, 2017)...................... 8

*In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936 (N.D. Cal. 2010) ........................................................... 15, 16

*In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401 MJJ, 2005 WL 1787860 (N.D. Cal. July 27, 2005) ................................ 16

*In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010)............................................................... 7, 8, 10, 12

*In re Downey Sec. Litig.*, No. 08 CV-3261-JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ...................... 14, 15

*In re ECOtality, Inc. Sec. Litig.*, No. 3:13-CV-03791-SC, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014)............... 9, 10, 17

*In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) .............................. 9

*In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848 (N.D. Cal. 2017)............................ 12

*In re Portal Software, Inc. Sec. Litig.*,
No. C-03-5138 VRW, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ............................ 22

*In re Quality Systems, Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017)........................................................................................ 9

*In re Rackable Sys., Inc. Sec. Litig.*,
No. C 09-0222 CW, 2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ................................ 13

*In re Rackable Sys., Inc. Sec. Litig.*,
No. C09-0222 CW, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010) .............................. 12, 22

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)...................................................................................... 6, 7

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)............................................................................ 19, 20, 21

*In re Taleo Corp. Sec. Litig.*,
No. C 09-00151 JSW, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ................................ 20

*In re Tibco Software, Inc. Sec. Litig.*,
No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006)......................... 10, 17

*In re XenoPort, Inc. Sec. Litig.*,
No. C-10-03301-RMW, 2011 WL 6153134 (N.D. Cal. Dec. 12, 2011).......................... 20

*Kovtun v. VIVUS, Inc.*,
No. C 10-4957 PJH, 2012 WL 4477647 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015) ................................ 20

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002).................................................................... 19, 20, 23

*McCasland v. FormFactor Inc.*,
No. C 07-5545 SI, 2008 WL 2951275 (N.D. Cal. July 25, 2008)..................................... 15

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)...................................................................... 7, 20, 21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)................................................................. 8, 9, 12, 18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
No. 10-CV-03451-LHK, 2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014) .................................................................................. 8

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)....................................................................... 7, 13, 21

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
No. CIV 06-02674-PHX-RCB, 2011 WL 1253250 (D. Ariz. Mar. 31, 2011)................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........ 7, 22

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998) ........ 17

*Wozniak v. Align Techs., Inc.*, No. C-09-3671 MMC, 2011 WL 2269418 (N.D. Cal. June 8, 2011) ........ 20, 22

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009)........ *passim*

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ........ 6

15 U.S.C. § 78u-4(b)(2)(A)........ 7

15 U.S.C. § 78u-5(i)(1)(A)........ 8

15 U.S.C. § 78u-5(i)(1)(D)........ 8, 9

15 U.S.C. § 78u-5(c)(1)(A)(i) ........ 7

15 U.S.C. § 78u-5(c)(1)(A)(i) ........ 11

15 U.S.C. § 78u-5(c)(1)(B) ........ 7, 10

15 U.S.C. § 78u-5(c)(2)(B) ........ 10, 11

**RULES**

Fed. R. Civ. P. 9(b)........ 6

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD IN THIS MATTER:**

PLEASE TAKE NOTICE that on March 1, 2018, at 9:00 a.m., defendants Gigamon Inc. ("Gigamon" or the "Company"), Paul A. Hooper and Michael J. Burns (collectively, "Defendants") will move to dismiss with prejudice all claims in Lead Plaintiffs' ("Plaintiffs") Amended Class Action Complaint For Violation of the Federal Securities Laws ("Complaint"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and Section 21D(b) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. § 78u-4(b). This motion is based on the pleadings, this Notice of Motion and Motion, the Memorandum of Points and Authorities; the Request for Judicial Notice in Support of Motion to Dismiss ("RJN"); the Declaration of Nicholas R. Miller and exhibits thereto, and other matters as may be presented in connection with the hearing on this motion.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiffs fail to adequately plead that Defendants violated Section 10(b) of the Exchange Act because Plaintiffs (a) challenge forward-looking statements protected by the Private Securities Litigation Reform Act's ("PSLRA") Safe Harbor, (b) fail to plead with particularity facts showing that Defendants made any actionable statements that were false or misleading, and (c) fail to plead with particularity facts that raise a strong inference of scienter.

2. Whether Plaintiffs' Section 20(a) claim under the Exchange Act fails for failure to plead a primary violation of Section 10(b) of the Exchange Act.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

For the nine consecutive quarters preceding the class period, Gigamon exceeded its quarterly financial guidance. During that time, from Q3 2014 through Q3 2016, Gigamon's quarterly revenue grew from $39.3 million to $83.5 million, and its annual revenues grew in excess of 40% per year in 2015. In Q4 2016, Gigamon fell roughly 7% short of its revenue guidance, reporting $85.0 million compared to guidance of $91-$93 million, but nonetheless met its guidance for gross margin and earnings per share. Against this backdrop of more than two

years of stellar growth and forecasting success, Plaintiffs contend this one-quarter shortfall was attributable to fraud.

This securities fraud class action is a prototypical example of the type of one-quarter, missed forecasting case that Congress intended to eliminate when it enacted the PSLRA more than twenty years ago. This Complaint should be dismissed on numerous independent grounds.

At the outset, the case should be dismissed because it concerns Defendants' forward-looking guidance for Q4 2016 and these statements are immunized from liability by the PSLRA's Safe Harbor provisions. There are two specific forward-looking statements at issue and both were made during a conference call that was subject to Safe Harbor warnings and that referred to detailed risk disclosures. Indeed, Gigamon warned of precisely the risk that caused the shortfall, decisions by a few customers to delay larger orders. Moreover, several of the challenged statements are phrased in vague descriptive terms, such as "healthy backlog" or "on-track," which are inactionable as a matter of law.

The Complaint should be dismissed for the independent reason that Plaintiffs fail to plead particularized facts showing that any challenged statement was false when made. Plaintiffs offer only a handful of confidential witnesses ("CWs"), only one of whom worked at Gigamon during the class period. Each was a low-level sales employee who had no interaction with the individual defendants and had nothing to do with and knows nothing about corporate forecasting. This is no more clearly demonstrated than by CW3's colorful statement that forecasts are based on "black magic" – which apparently worked because Gigamon exceeded guidance during CW3's eight quarters of employment.

The Complaint is equally defective because it offers no facts suggesting any inference of scienter, let alone the strong inference required by the PSLRA. No internal document or CW offers any factual basis to conclude that Defendants did not believe what they said. Equally lacking is any evidence of motive. CEO Paul Hooper sold the same number of shares during the class period as he had in the quarter preceding the class period, all those sales were made pursuant to a Rule 10b5-1 plan, and his class period sales amounted to only 16% of his holdings. Plaintiffs offer only speculation about whether CFO Burns, who resigned as Gigamon's CFO at

the start of the class period, sold any shares; in any event, sales by a former officer are hardly suspicious.

The Safe Harbor should preclude this action from continuing. Regardless, there is no particularized factual basis to find that Defendants made false statements or acted with scienter. This one-quarter, missed forecasting case should be dismissed with prejudice.

## II. STATEMENT OF FACTS

### A. Defendants

Gigamon is a technology company headquartered in Santa Clara that sells products and services that enable companies to monitor and control data traveling across complex networks. ¶¶ 19, 26; Ex. 1 at 3.[1] As of December 31, 2016, Gigamon had over 2,300 end-user customers, including 81 of the Fortune 100 companies and 418 of the Fortune 1000 companies. Ex. 2 at 7. Gigamon went public in mid-2013 and its stock is traded on the New York Stock Exchange. ¶¶ 19, 33.

Mr. Hooper is Gigamon's CEO. ¶ 20. Mr. Burns was Gigamon's CFO until October 27, 2016 (the first day of the class period), when he resigned as CFO to pursue other opportunities. ¶¶ 21, 31; Ex. 3 at Ex. 99.2; Ex. 4.

### B. For Nine Consecutive Quarters Before the Class Period, Gigamon Exceeded Its Quarterly Guidance.

Gigamon consistently exceeded its public revenue guidance from Q3 2014 through Q3 2016:

[1] References to "¶ _" are to the Complaint. References to "Ex. _" are to exhibits attached to the Declaration of Nicholas R. Miller, which are documents either referenced in the Complaint or subject to judicial notice. *See* RJN.

| Quarter | Revenue Guidance (MM) | Actual Revenue (MM) |
|---|---|---|
| Q3 2014 | ~$34.9 | $39.3 |
| Q4 2014 | $41-$44 | $51.3 |
| Q1 2015 | $40-$43 | $46.9 |
| Q2 2015 | $48-$51 | $51.4 |
| Q3 2015 | $53-$56 | $56.7 |
| Q4 2015 | $61-$64 | $67.0 |
| Q1 2016 | $61-$63 | $67.2 |
| Q2 2016 | $69-$71 | $75.1 |
| Q3 2016 | $78-$80 | $83.5 |

*See* Exs. 5-14. During this period, Gigamon reported stellar year-over-year revenue growth. For fiscal 2015, revenue grew 41% compared to 2014 (Ex. 1 at 44) and, for the first three quarters of 2016, revenue grew 46% compared to the comparable period in 2015 (Ex. 15 at 27).

**C. On October 27, 2016, Gigamon Provided Q4 2016 Guidance.**

On October 27, 2016, Gigamon reported its financial results for Q3 2016 and provided guidance for Q4 2016. ¶ 31; Ex. 3 at Ex. 99.1. For Q3 2016, Gigamon announced record revenue of $83.5 million, up 47% compared to the prior year. Ex. 3 at Ex. 99.1.

During a conference call later that day, Messrs. Hooper and Burns gave guidance about Gigamon's expected performance for Q4 2016. ¶¶ 46-47. Plaintiffs challenge two such statements. ¶ 48. First, Mr. Burns stated that the Company's "large deferred service, healthy product backlog, and consistent quarterly linearity continue to provide good visibility on growth, profits and execution," and that Gigamon expected Q4 2016 revenue in the range of "$91 million to $93 million," or 37% year-over-year growth at $92 million. ¶ 47. Second, Mr. Hooper stated: "[a]s we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability . . . ." ¶ 46; Ex. 14 at 6.

The Complaint also appears to challenge several purportedly "overly-optimistic comments" about Gigamon's "outlook" that were made by Mr. Hooper during a September 23, 2016 interview with The Wall Street Transcript, a November 2, 2016 Needham conference, and a November 30, 2016 Credit Suisse conference. ¶ 44. The statements generally concern Gigamon's reported revenue and growth rates. Mr. Hooper also noted that Gigamon was

"currently running to around that $315 million revenue this year . . . ." ¶ 6; Ex. 16 at 5. Plaintiffs contend this statement is indicative of scienter. ¶ 62.

**D. On January 17, 2017, Gigamon Pre-Announced That It Would Miss Its Q4 2016 Revenue Guidance by 7.6%.**

On January 17, 2017, the Company issued a press release pre-announcing that it expected Q4 2016 revenue of $84.5 million to $85.0 million, which still represented 40% annual growth compared to the prior year. ¶ 53; Ex. 17 at Ex. 99.1. Mr. Hooper explained that Q4 revenue fell short "primarily due to lower than expected product bookings in our North America West region, as several significant existing customer accounts deferred purchasing decisions into 2017." ¶ 53. In response, Gigamon's stock price decreased from $44.05 to $31.40. ¶ 9.

On February 2, 2017, Gigamon reported its Q4 2016 results: revenue of $85 million (¶ 56), within the pre-announcement range, non-GAAP income of $0.37 per share, which met its original guidance (Ex. 18 at Ex. 99.1), and gross margin of 84%, above its original guidance (*id.*). *See* Ex. 14 at 7 (providing Q4 2016 non-GAAP income per share and gross margin guidance). On a conference call later that day, Mr. Hooper reiterated that the Q4 2016 revenue miss was due to lower than expected bookings in the North America West region because several significant large accounts had deferred purchasing decisions to 2017. ¶ 56; Ex. 19 at 3. He noted that some of these large customers had made purchases in Q4 2016 but had purchased less than expected. Ex. 19 at 9. In response, Gigamon's stock price declined from $32.10 to $30.40 (¶ 12; Ex. 20), but quickly recovered, closing at $32.54 just two trading days later. Ex. 20.

Thus, while Gigamon fell short of its Q4 2016 revenue guidance, the Company still reported its second consecutive year of 40%+ annual revenue growth (Ex. 2 at 41, 43; Ex. 18 at Ex. 99.1), and its annual non-GAAP earnings per share grew by 58% (Ex. 19 at 7).

**E. Summary of Plaintiffs' Allegations.**

Plaintiffs purport to bring this action on behalf of persons or entities that purchased or otherwise acquired securities of Gigamon between October 27, 2016 and February 2, 2017 (the "Class Period"). ¶ 1. The Complaint asserts causes of action under Sections 10(b) and 20(a) of the Exchange Act. ¶¶ 90-107. Plaintiffs challenge the statements made on October 27 by Mr.

Burns and Mr. Hooper about the Company's guidance and expectations for Q4 2016. ¶¶ 47-48. Although the Complaint is unclear, Plaintiffs also appear to challenge the statements made by Mr. Hooper to analysts in September and November 2016. ¶ 44. Plaintiffs rely on five CWs to allege that these statements were false when made. ¶¶ 35-43. Plaintiffs contend that a strong inference of scienter is shown by Mr. Hooper's statement to analysts on November 2 that Gigamon was "currently running to around that $315 million revenue this year" and by the individual defendants' alleged sales of Gigamon stock. ¶¶ 61-73.

## ARGUMENT

### I. LEGAL STANDARD

A claim under Section 10(b) must allege: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court need not accept legal conclusions asserted as "facts." *Id.* at 578-79. Further, the Court may consider materials incorporated into the Complaint by reference and other matters subject to judicial notice. *Zucco*, 552 F.3d at 989. Because Section 10(b) claims sound in fraud, Plaintiffs also must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires them to "state with particularity the circumstances" constituting the alleged fraud. Fed. R. Civ. P. 9(b).

The PSLRA further heightened the pleading requirements by "requir[ing] that a complaint 'plead with particularity both falsity and scienter.'" *Zucco*, 552 F.3d at 990 (citation omitted). "Under the PSLRA, to properly allege falsity, a securities fraud complaint must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.'" *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)). "To meet this pleading requirement, the complaint must contain allegations of specific 'contemporaneous

statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (citation omitted). Thus, "[a] litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

To adequately plead scienter, a complaint "must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Rigel Pharm.*, 697 F.3d at 877 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Defendants only act with the required state of mind if they "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (citation omitted). The scienter analysis "is inherently comparative." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). A court must take into account "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. Courts "must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

## II. PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE FALSE STATEMENT

### A. The Challenged Statements Are Forward-Looking and Protected by the PSLRA's Safe Harbor.

The Safe Harbor of the PSLRA immunizes forward-looking statements from liability as a matter of law if they are (i) identified as forward-looking, and (ii) accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112-13 (9th Cir. 2010); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1061 (N.D. Cal. 2012).[2] For such statements, "the state of mind of the individual making

[2] Even if forward-looking statements are not accompanied by meaningful cautionary language, Plaintiffs still must show that the statements were made with actual knowledge of falsity when made (15 U.S.C. § 78u-5(c)(1)(B)). As discussed below at Section III, the Complaint alleges no such facts.

the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *Cutera*, 610 F.3d at 1112. Here, both elements of the Safe Harbor are met.

**1. The Challenged Statements Are Forward-Looking and Were So Identified.**

The PSLRA defines a forward-looking statement to include statements "containing a projection of revenues, income (including income loss) . . . or other financial items," as well as "any statement of the assumptions underlying or relating to any [such] statement." 15 U.S.C. § 78u-5(i)(1)(A) & (D). The Ninth Circuit recognizes that revenue projections are by definition forward-looking statements. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face.").

Here, all the statements Plaintiffs challenge are forward-looking. First, Mr. Burns' statement on October 27 that "[w]e expect fourth quarter revenue in the range of $91 million to $93 million" (¶ 47) is plainly forward-looking. *See, e.g.*, *Juniper Networks*, 880 F. Supp. 2d at 1062 (revenue guidance is a "prototypical example[]" of a "forward-looking statement"). The preceding sentence, in which Mr. Burns referred to the large deferred service, healthy product backlog, linearity and visibility, provided the underlying assumptions for the forward-looking guidance and, thus, is also protected as a matter of law. ¶ 47; 15 U.S.C. § 78u-5(i)(1)(A) & (D).

Second, Mr. Hooper's statement on October 27 is also a forward-looking statement protected by the Safe Harbor. He said: "[a]s we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability." ¶ 46. Statements that a company is "on track" to achieve a future goal are forward-looking statements. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2012 WL 1868874, at *10 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014) (statement that "revenue 'is on track to grow 55% this year'" was forward-looking); *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, No. CV-1507952-CASR-AOX, 2017 WL 114401, at *5-6 (C.D. Cal. Jan. 9, 2017) (statement that company was "on track" to complete migration to new platform was forward-looking).

While Plaintiffs may argue that Mr. Hooper's statement that backlog was "healthy" and that Gigamon was "on track" are present tense statements, those statements are still protected by the Safe Harbor. The Safe Harbor explicitly protects "any statement of the assumptions underlying or relating to" an otherwise forward-looking statement (*see* 15 U.S.C. § 78u-5(i)(1)(D)). The Ninth Circuit recently held in *Intuitive Surgical* that statements like Mr. Hooper's were forward-looking because they were assumptions underlying or related to a projection, or reflected the speaker's expectation of the future impact of a particular fact. 759 F.3d at 1059. There, the company provided revenue projections and expected growth for particular medical procedures. The Ninth Circuit held that statements such as "[g]ynecology plays a bigger and bigger role each day . . . [G]ynecology is a big player in that, and I think will continue to be and continue to expand" were forward-looking because they related "to future economic performance or assumptions underlying those projections . . . ." *Id.* at 1058-59. The court determined that, "examined as a whole, the challenged statement[] related to future expectations and performance." *Id.* at 1059; *see In re ECOtality, Inc. Sec. Litig.*, No. 3:13-CV-03791-SC, 2014 WL 4634280, at *5 (N.D. Cal. Sept. 16, 2014) (statement that "[w]ith our network and growth strategy . . . we should be able to capture a reasonable share of this market over time" was forward-looking) (alternations in original); *In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869, at *11 (N.D. Cal. Feb. 12, 2015) (statement that "[w]e continue to believe we have a compelling opportunity in this market environment . . . given that our products generate a significant return on investment for our customers" was forward-looking).[3] Here, Mr. Hooper's statement about healthy backlog and that Gigamon was on track

[3] The Ninth Circuit's recent decision in *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017), answered a question left open by *Intuitive Surgical*, whether mixed tense statements could be actionable. There, the Ninth Circuit held that certain present tense statements were not protected by the Safe Harbor but did not analyze the Safe Harbor provision that expressly protects assumptions underlying or related to forward-looking statements and therefore did not address statements analogous to this matter. 15 U.S.C. § 78u-5(i)(1)(D).

were part of his overall forward-looking statement that Gigamon expected accelerating revenue growth and expanding profitability.[4]

There can be no debate that Gigamon gave the required Safe Harbor warnings before making the challenged forward-looking statements. At the beginning of the October 27 call, Gigamon clearly warned that its executives would make "forward-looking statements" related to future "financial or operating performance" and "guidance for future periods" and that "results in future periods are subject to risks and uncertainties that could cause actual results to differ . . . ." Ex. 14 at 3. *See* 15 U.S.C. § 78u-5(c)(2)(B) (oral forward-looking statement protected by Safe Harbor if it refers to readily available documents containing meaningful cautionary statements); *In re Tibco Software, Inc. Sec. Litig.*, No. C 05-2146 SBA, 2006 WL 1469654, at *26 (N.D. Cal. May 25, 2006) (Safe Harbor effective where warning made at outset of call that specified types of statements, cautioned that actual results could differ, and directed listeners to recent SEC filings for risk factors).[5]

### 2. Gigamon Identified Important Risk Factors That Could Cause Actual Results To Vary.

Gigamon satisfied the second requirement of the Safe Harbor because its oral forward-looking statements referred to the risk factors contained in the press release it issued that day and to its SEC filings, all of which contained meaningful cautionary language identifying important factors that could cause actual results to differ materially. Ex. 14 at 3; *see Cutera*, 610 F.3d at

---

[4] Defendants recognize that courts in this District have differed about whether a statement that something is "on track" is forward-looking. *See ECOtality*, 2014 WL 4634280, at *5-7 (citing cases). Defendants believe that these decisions are case-specific, and that the correct conclusion here is that Gigamon's statement that it was "on track" to achieve certain metrics in the future expressly contemplates an ongoing effort, rather than a past or current completion, and should be understood as forward-looking.

[5] To the extent Plaintiffs challenge the Company's "overly-optimistic" statements made to analysts (¶ 44), Plaintiffs concede that such statements concern the Company's "outlook" and thus are forward-looking. At the November 2 Needham conference, Mr. Hooper noted that he would discuss "forward-looking statements" protected by the "Safe Harbor." Ex. 16 at 2. Thus, the November 2 statements are protected by the Safe Harbor. Even if his remarks to analysts on September 23 and November 30 were not accompanied by the initial warning, Plaintiffs still are required to show that Mr. Hooper actually knew his statements were false or misleading when made (15 U.S.C. § 78u-5(c)(1)(B)); as described below in Section III, they have not done so.

1112-13; 15 U.S.C. § 78u-5(c)(1)(A)(i) & (c)(2)(B). A company is not required to list all factors that might cause results to differ from those forecasted, but is only required to warn of important factors of similar significance to those actually realized. *See Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017) ("cautionary language given does not need to warn of the 'exact risk' that transpires and causes a company to miss a guidance forecast."); *Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *5 (N.D. Cal. Mar. 2, 2012) ("the PSLRA does not require a listing of all factors that might make the results different from those forecasted.") (citation omitted).

The risk factors in Gigamon's October 27 press release and in its SEC filings contained extensive cautionary language about many important factors that could prevent it from achieving its revenue guidance – indeed, Gigamon described the very risks that came to pass and ultimately caused it to miss its revenue guidance, major customers deferring purchasing decisions. For example, Gigamon's Form 10-Q contained detailed warnings such as:

- "if we fail to close a large transaction or multiple smaller transactions that we expect to close in a given period, our operating results . . . may be materially adversely affected"; and,
- "[a]ctual results may vary from our guidance and the variations may be material" because of "the timing of orders from our channel partners and end-user customers" or "the budgeting cycles and internal purchasing priorities of our end-user customers . . . ."

Ex. 21 at 35, 37, 50. Gigamon also warned that actual results could vary because of "customer acceptance and purchase of our existing products" and "our ability to retain existing customers . . . ." Ex. 3 at Ex. 99.1. And, Gigamon's Form 10-Q cautioned that the Company's guidance "is necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the guidance furnished by us will not materialize or will vary significantly from actual results." Ex. 21 at 50. Gigamon also included twenty pages of numerous other important risk factors, all of which could cause actual results to vary from guidance. *Id.* at 33-52. These cautionary warnings are more than sufficient to immunize Gigamon's forward-looking

statements from liability. Accordingly, Defendants' motion to dismiss should be granted with prejudice. *See Cutera*, 610 F.3d at 1112-13.[6]

**B. Vague Statements of Corporate Optimism Are Not Actionable.**

Even if the Court were to find that the statements about "healthy" product backlog, "large" deferred service revenue, "consistent" quarterly linearity, and that Gigamon was "on track" to deliver "accelerating top-line revenue growth and expanding profitability" were not forward-looking, all of these statements should be dismissed as puffery. ¶¶ 46-47. Courts recognize that such vague and subjective statements of corporate optimism cannot support a claim of securities fraud. *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1060 (statements such as "opportunity for system placement at hospitals 'is still very, very large'" not actionable); *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("alleged optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery."); *Fadia v. FireEye, Inc.*, No. 5:14-CV-05204-EJD, 2016 WL 6679806, at *8-9 (N.D. Cal. Nov. 14, 2016) (Davila, J.) (statements about business being "very healthy" and sales cycles being "consistent" were non-actionable puffery); *In re Rackable Sys., Inc. Sec. Litig.*, No. C09-0222 CW, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (statements that relationship with customers was "pretty strong" and "solid" not actionable) (citation omitted).

**C. Plaintiffs Fail To Allege Particular Facts Showing That Any Alleged Misstatement Was False or Misleading When Made.**

The Complaint should independently be dismissed because Plaintiffs fail to adequately plead contemporaneous facts showing that any of the challenged statements were false or misleading when made.

---

[6] Even assuming *arguendo* some technical defect in the cautionary language, the forward-looking statements would still be protected from liability under the "bespeaks caution" doctrine, which "provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Emp'r Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (citation omitted).

**1. The Fact That Guidance Was Not Achieved Does Not Establish Falsity.**

The fact that Gigamon's actual results turned out differently from the guidance given on October 27 does not show that the guidance or Defendants' stated underlying assumptions were false when made. "[F]ailing to meet a projection does not make the projection a misrepresentation." *In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222 CW, 2010 WL 3447857, at *8 (N.D. Cal. Aug. 27, 2010). Plaintiffs must point to specific contemporaneous documents or facts demonstrating that a statement was false when made. *Ronconi*, 253 F.3d at 431. As shown below, Plaintiffs point to no document or contemporaneous confidential witness statement suggesting that Messrs. Hooper or Burns made a false statement about their expectations for Q4 2016. Likewise, Plaintiffs have no information even concerning much less undermining the assumptions underlying Defendants' guidance, the "large" deferred service revenue, the "healthy" backlog, or "consistent" quarterly linearity. Indeed, Defendants never provided specifics about what these metrics were or what they were expected to be.[7]

**2. The CW Allegations Fall Far Short of Showing That the Challenged Statements Were False or Misleading.**

Plaintiffs try to support their claims by relying on statements from five low-level former sales employees. CW allegations cannot support a securities fraud claim unless they "provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco*, 552 F.3d at 995 (citation omitted). Courts are to examine "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged, . . . the coherence and plausibility of the allegations, the number of sources, the reliability of the

---

[7] Product backlog "includes orders for products scheduled to be shipped within 90 days to customers with approved credit status, and is net of service revenue allocations and any rebates and discounts." ¶ 29. The Complaint erroneously claims that Gigamon provided a backlog estimate for Q4 (¶¶ 4, 32) – there is no evidence to support this because Gigamon did not do so. On February 2, 2017, Gigamon disclosed that product backlog at the end of Q4 2016 was $3.1 million, compared to $6 million to $8.5 million in the preceding six quarters. ¶ 56; Ex. 19 at 6. Nothing about this disclosure suggests that the backlog at the *start* of Q4 was not "healthy" or "consistent" with prior quarters.

sources, and similar indicia." *Id.* (citations omitted) (internal quotation marks omitted). None of Plaintiffs' CWs have anything to say about Gigamon's Q4 2016 revenue guidance, the assumptions underlying it, the reasons that Gigamon failed to achieve its guidance, what Messrs. Hooper or Burns allegedly knew about the Q4 2016 guidance, or the Company's backlog, deferred service revenue, or quarterly linearity. Indeed, these CWs offer nothing remotely relevant.

**a. CW1**

CW1 was a Manager of Renewals and Orders at Gigamon from March 2014 to June 2016. ¶¶ 35, 37. Significantly, CW1 did not work at Gigamon during the Class Period or even during the preceding quarter. Thus, CW1 could not know anything about the Q4 2016 guidance, and these allegations must be disregarded. *See, e.g.*, *In re Downey Sec. Litig.*, No. 08 CV-3261-JFW (RZx), 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (disregarding allegations from CWs who left company before the start of the class period). In any event, CW1's statements are irrelevant to the challenged statements. For example, CW1 stated that when the Company appointed Helmut Wilke as Senior Vice President of Worldwide Sales, way back in August 2014, "it was '[f]ollow the new rules or you're out.'" ¶ 36. It is unclear how "following the rules" is problematic; to the contrary, "following the rules" worked brilliantly, as Gigamon met its revenue guidance for nine consecutive quarters.

**b. CW2**

Like CW1, CW2's allegations should be disregarded because CW2 left Gigamon in August 2016, before the start of the Class Period, and so knows nothing about forecasting for Q4 2016. *See* ¶ 35 (CW2 was Regional Sales Director at Gigamon from January 2015 to August 2016). Moreover, CW2's allegations are so vague as to be meaningless. CW2 "recalled some statistical theory or formula that explained how the numbers were realistic or manageable, but the bottom line was that, in practice, the new quotas were impossible to achieve and employees ultimately left." ¶ 39. CW2 had "no additional information about the 'theory,' he just recalled something similar to a theory that explained how it would work, but it ultimately did not work." *Id.* Absent are any details about what "quotas" referred to, how those quotas were integrated into

a revenue forecast, and how many employees left. *See, e.g.*, *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (rejecting CW allegations which offered no facts relevant to corporate level forecasts); *Downey*, 2009 WL 2767670, at *9 ("[T]he statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation."); *McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) (rejecting CW allegations because none were "alleged to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period."). The short answer to all of CW2's information, of course, is that, during his seven quarters at Gigamon, the Company exceeded its revenue guidance in every single quarter – so CW2 aside, the "statistical theory or formula" he refers to clearly worked well.

**c. CW3**

CW3's statements can be dispensed with quickly. CW3 was also a low-level Sales Director who left in June 2016, before the Class Period, and so knows nothing about Q4 2016. ¶ 40 (alleging CW3 worked at Gigamon from June 2014 to June 2016). *See Zucco*, 552 F.3d at 996 (discounting CWs who were not employed at company during relevant period). CW3's observation that Gigamon's guidance was based on the CEO, CFO and VP of Sales (¶ 40) is hardly remarkable and in no way undermines the reasonableness of the guidance that was given for Q4 2016. CW3's statement that forecasts are "rolled up" based on individual territories and sometimes are based on "black magic" appears to refer to how low-level sales forecasts are consolidated and lead to the Company's overall guidance. *Id.* At most, this allegation demonstrates that CW3 has no idea how this is done – to CW3, it's all "black magic."[8] Colorful rhetoric aside, CW3 knows nothing about any specific forecast for any specific territory, or whether it should have been different and why, let alone any information suggesting that the

---

[8] Plaintiffs' assertion that there were "numerous failures in forecasting" involving "black magic" is mystifying. ¶ 44. The Company exceeded guidance for nine quarters in a row before the Class Period.

Court should question the overall rollup and judgments of senior management. Equally pointless is CW3's statement that "[if] too many dominoes fall when they shouldn't there could be a big problem" (¶ 40) – well of course that statement of the obvious is true for any company at any time, but it shows nothing about the truth or falsity of Gigamon's Q4 2016 guidance and, clearly, no dominoes fell in the prior nine quarters.

**d. CW4**

All that CW4 offers is pure speculation and unsupported opinion. CW4 (a Regional Sales Director from September 2015 to January 2017) "opined" that the Company "*might* have been too arrogant concerning 'the numbers' at the end of the quarter." ¶ 41 (emphasis added). Not only is it unclear what quarter CW4 was referring to, such a qualified statement of opinion rendered in hindsight by a low-level salesperson proves nothing. Equally unavailing is CW4's hindsight opinion that the Company "*likely* held to a 'number that they shouldn't have.'" (emphasis added). *See, e.g.*, *Bao v. Solarcity Corp.*, No. 14-CV-01435-BLF, 2016 WL 54133, at *5 (N.D. Cal. Jan. 5, 2016) (rejecting CW allegations that were "too conclusory, speculative, and/or vague to hold weight"); *Accuray*, 757 F. Supp. 2d at 945 ("Hindsight and the former opinions of former employees do not generally rise to the level of falsity.").

**e. CW5**

CW5 joined Gigamon *after* the Class Period and reports no personal knowledge of the events of Q4 2016. *See* ¶ 42 (CW5 was Regional Sales Director from February 2017 to July 2017). Nothing offered by CW5 is relevant to showing the contemporaneous falsity of the Company's Q4 2016 guidance. Rather, CW5 reports frustration upon being terminated a few months later for not securing government contracts, which he was specifically hired to do. *See, e.g.*, *In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401 MJJ, 2005 WL 1787860, at *6 (N.D. Cal. July 27, 2005) (CW allegations "long on speculation, but short on relevant detail" insufficient).

* * *

In short, the inadequacy of these CWs cannot be overstated. All were lower level sales persons who had no contact with any individual defendant, were not involved in the corporate

forecasting process (only one worked at Gigamon during the Class Period), and do not know why the Company missed its Q4 2016 guidance.

**3. The Miscellaneous Statements To Analysts Are Not Actionable.**

Plaintiffs also appear to allege that statements made by Mr. Hooper in three analyst conferences and interviews were "overly-optimistic" about the Company's outlook. ¶ 44. Similar pleading tactics have been criticized in securities class actions. *See, e.g.*, *ECOtality*, 2014 WL 4634280, at *3 (criticizing practice of quoting various documents without clearly stating how statement was false). Regardless, none of the statements are actionable because Plaintiffs fail to plead any contradictory, contemporaneous facts. *Tibco*, 2006 WL 1469654, at *23 (plaintiffs must allege, with particularity, "contemporaneous statements or conditions" that are so "inconsistent" with the challenged statement as to show that it was false when made) (citation omitted); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."). Indeed, each optimistic statement was based upon accurate historical facts.

During a September 23, 2016 interview with The Wall Street Transcript, Mr. Hooper noted that "North America is growing at a rate of 40% to 50% year over year," Gigamon was a "fast-growing company," "[l]ast quarter was 45% year-over-year growth" and Gigamon experienced growth "at 41% last year and 45% last quarter . . . ." ¶ 44; Ex. 22 at 1, 3. At the outset, these pre-class period statements cannot be actionable. *See Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, No. CIV 06-02674-PHX-RCB, 2011 WL 1253250, at *32 (D. Ariz. Mar. 31, 2011) (defendants cannot be liable for statements outside class period). In any event, each statement was accurate: revenue for the Americas was up 52% (Ex. 21 at 19); revenue for the first six months was up 45% year-over-year (*id.* at 25); fiscal year 2015 revenue was up 41% (Ex. 1 at 44); and, Q2 2016 revenue was up 46% year-over-year (Ex. 21 at 25).

During the Needham conference on November 2, 2016, Mr. Hooper referred to Gigamon's growth as "impressive" and noted that "[o]ver the last four years, it's been 32% CAGR." ¶ 44; Ex. 16 at 5. Mr. Hooper also noted that Gigamon's revenue for 2015 grew 41%

compared to 2014, that revenue had grown 46% year-over-year for the first nine months of 2016, and had accelerated in each quarter in 2016. ¶ 44; Ex. 16 at 5.

These statements were true: Gigamon had grown at these levels over the past four years (Ex. 1 at 37); 2015 revenue was up 41% (*id.* at 44); and, revenue for the first nine months of 2016 was up 46% and had grown 43% in Q1, 46% in Q2, and 47% in Q3 (Ex. 15 at 27; Ex. 21 at 25; Ex. 23 at 25).

Mr. Hooper also stated "we are a 55% growth Company hidden in a 47% skin. <u>Now, I don't want to set that as the expectation going forward. Please don't take that as forward-looking guidance</u>." ¶ 44; Ex. 16 at 14 (Plaintiffs misleadingly omitted the underlined language). At best, this statement is puffery and was clearly and explicitly not intended to be a projection of Gigamon's future growth. *See Intuitive Surgical*, 759 F.3d at 1060 (corporate puffery not actionable).

Finally, during a November 30, 2016 conference with Credit Suisse, Mr. Hooper stated: "Last year, we grew at 41%. Last quarter, we grew at 47% against the market [that] is independently assessed of growing up 25%. And if we look ahead, the market growth rates remain the same at 25% and I think consensus has it at 25% year-over-year growth. We have repetitively outperformed consensus, repetitively outperformed the market." ¶ 44; Ex. 24 at 3. Again, these comments were all true: 2015 revenue was up 41% (Ex. 1 at 44); Q3 grew 47% year-over-year (Ex. 15 at 27). Plaintiffs offer no basis to dispute the 25% consensus market growth rate referred to by Mr. Hooper; in any case, even with the Q4 2016 disappointment, Gigamon beat the consensus and reported 27% year-over-year growth. Ex. 19 at 4.

## III. PLAINTIFFS FAIL TO ALLEGE FACTS TO SUPPORT A STRONG INFERENCE OF SCIENTER

The Complaint should independently be dismissed for failure to plead facts giving rise to a strong inference of scienter. Plaintiffs fail to allege any facts suggesting that Defendants did not believe the challenged statements when made on October 27, 2016. Indeed, the Company's strong track record of exceeding its quarterly guidance over the prior nine quarters demonstrates that Messrs. Hooper and Burns believed in good faith in the Company's ability to accurately

forecast its quarters.

Plaintiffs argue that a statement made by Mr. Hooper at the November 2 Needham conference undermines the Q4 guidance he gave a few days earlier. ¶ 62. Plaintiffs also point to the individual defendants' stock sales (¶ 64) but, considered in context as required by Ninth Circuit law, the trading history refutes any inference of scienter. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035, 1038 (9th Cir. 2002).

**A. Mr. Hooper's November 2 Statement Does Not Suggest Scienter.**

At the Needham conference on November 2, Mr. Hooper said that Gigamon was "currently running to around that $315 million revenue this year . . . ." ¶ 6; Ex. 16 at 5. Adding $92 million (the midpoint of Q4's guidance range of $91-$93 million) to total revenue through Q3 ($226 million) totals $318 million. Plaintiffs thus argue that Mr. Hooper's statement "currently running to around . . . $315 million" shows that he believed Q4 revenue would be only $89 million. ¶ 62; Ex. 16 at 5. That is a slender reed to support a fraud claim.

Clearly, Mr. Hooper was just approximating the annual revenue number in his head when he said that Gigamon was on track for "around" $315 million in revenue, which was true. Saying "around $315 million" cannot reasonably be read to be an admission that Mr. Hooper was modifying the guidance provided only four days earlier. This is clear because the statement was made publicly at an analyst conference, and no analyst interpreted Mr. Hooper's statement to be a guidance reduction or warning that Q4 guidance would not be achieved. Rather, analysts continued to cite $91 million to $93 million as Gigamon's Q4 guidance. *See* Ex. 25 at 1 (noting revised guidance on January 17, 2017 was below the midpoint of prior guidance of $92 million); Ex. 26 at 1 (noting prior guidance of $91.0 million to $93 million). Plaintiffs offer no reasonable basis for the Court to conclude otherwise.

**B. Plaintiffs' Stock Sale Allegations Do Not Support An Inference of Scienter.**

In the Ninth Circuit, only stock sales that are "unusual," "suspicious," or "dramatically out of line with prior trading practices" can give rise to an inference of scienter. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (citations omitted). In evaluating stock sales, courts consider "(1) the amount and percentage of shares sold by insiders; (2) the

timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* Here, none of the alleged sales hint at scienter.

**a. Mr. Hooper**

Mr. Hooper sold 45,000 shares of Gigamon stock on October 31, 2016, all pursuant to a Rule 10b5-1 trading plan he adopted on May 19, 2015. ¶ 65; Ex. 27. It is well-established that trades pursuant to a Rule 10b5-1 trading plan cannot support an inference of scienter. *See, e.g.*, *Kovtun v. VIVUS, Inc.*, No. C 10-4957 PJH, 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012) (trades made pursuant to Rule 10b5-1 trading plan not suspicious), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592, 593 (9th Cir. 2015); *In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987, at *12 (N.D. Cal. Feb. 17, 2010) (sales made pursuant to Rule 10b5-1 plans cannot support scienter). The timing of Mr. Hooper's automatic Rule 10b5-1 sales are not suspicious, as they occurred just days after Gigamon's announcement of Q3 2016 results, which courts find typical. *See, e.g.*, *Lipton*, 284 F.3d at 1037 (corporate officers typically trade after "public release of quarterly earnings").

Mr. Hooper sold only about 16% of his Class Period holdings (even using the Complaint's mistaken allegation that he sold 52,222 shares rather than the 45,000 shares he actually sold).[9] This falls far short of percentages found suspicious in the Ninth Circuit and by this Court. *See Wozniak v. Align Techs., Inc.*, No. C-09-3671 MMC, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) ("The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter.") (citing *Metzler*, 540 F.3d at 1067); *FireEye*, 2016 WL 6679806, at *14 (sales of "17.6%, 8.7%, and 15%" of Defendants' total stock

---

[9] The Complaint mistakenly includes 7,222 shares withheld to cover tax withholding. ¶ 67. *See, e.g.*, *In re XenoPort, Inc. Sec. Litig.*, No. C-10-03301-RMW, 2011 WL 6153134, at *6 (N.D. Cal. Dec. 12, 2011) (shares withheld to pay taxes insufficient to support an inference of scienter).

The percentage is calculated by dividing the number of shares sold by total Class Period holdings. Total Class Period holdings include shares owned and options exercisable during the Class Period. Gigamon's April 22, 2016 proxy statement provided shares owned as of March 31, 2016 and the number of shares exercisable from outstanding equity awards as of May 30, 2016 (322,256 shares). Ex. 28 at 50. Added to that total are shares acquired and equity awards which vested between May 30, 2016 and the end of the Class Period (91,564 shares). Subtracted from that total are shares disposed between March 31, 2016 and the start of the Class Period (89,445 shares). Ex. 27. The resulting total (324,375 shares) is Mr. Hooper's Class Period holdings.

holdings failed to raise a strong inference of scienter).[10]

Mr. Hooper's sales were consistent with his prior trading history. He also sold 45,000 shares in August 2016, before the Class Period, and he sold 30,000 shares in each of the prior three quarters, in May 2016, February 2016, and November 2015. Ex. 27. *See Metzler*, 540 F.3d at 1067 (no inference of scienter where defendants sold in manner consistent with pre-class period sales).

**b. Mr. Burns**

Plaintiffs speculate that Mr. Burns "may" have sold shares during the Class Period after he resigned as CFO. ¶ 68. Plaintiffs offer no basis for this allegation. Plaintiffs have simply compared the number of shares Mr. Burns held as of September 23, 2016 to those he held as of April 30, 2017, assumed that Mr. Burns sold all of those shares at the Class Period high price, and calculated the hypothetical gross proceeds. *Id.* Clearly, no inference of scienter can be drawn from this rank speculation. *See, e.g.*, *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1113 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (speculative calculations were not "facts").[11]

**c. Non-Defendants**

Plaintiffs' allegations about stock sales by non-defendants can be ignored. Courts do not consider allegations of stock sales by non-defendants in evaluating an inference of defendants' scienter. *See, e.g.*, *Browning v. Amyris, Inc.*, No. 13-CV-02209-WHO, 2014 WL 1285175, at *17

---

[10] Plaintiffs incorrectly allege that Mr. Hooper sold 25% of his stock on October 31 (¶ 65) because they fail to count his vested equity awards. As Ninth Circuit law makes clear, shares owned during the Class Period *and* any exercisable options represent an individual's trading potential and should be used to calculate the percentage of holdings sold. *See Silicon Graphics*, 183 F.3d at 986-87; *Ronconi*, 253 F.3d at 435 n.25 (exercisable options should be considered in calculating the percentage of shares sold).

[11] Plaintiffs suggest there was something suspicious about Mr. Burns' departure, alleging that Mr. Hooper "changed the story." ¶ 34. There is no changed story creating any suspicion here. Mr. Burns said on October 27 that he was "looking forward to taking a little time off and enjoying some of the rewards and then I'll look for my next gig sometime next year." Ex. 14 at 9. Mr. Hooper said in substance the same thing at the analyst conference on December 6, 2016. ¶ 34 ("[I]t was kind of a mutual decision that he was going to take some time off, go and do some – a lot of traveling with his wife . . . ."). In any event, executive departures, without more, do not create any inference of scienter. *Zucco*, 552 F.3d at 1002 (conclusory allegations that a financial manager resigned or retired shortly before restatement did not support scienter).

n.5 (N.D. Cal. Mar. 24, 2014) ("Because the plaintiffs do not explain how stock sales by non-defendants relate to the issue of whether the defendants acted with scienter, there is no need to consider such stock sales."); *Align Tech*, 2011 WL 2269418, at *14 ("[s]ales by insiders not named as defendants . . . are irrelevant to the determination of the named defendant's scienter"); *Rackable*, 2010 WL 199703, at *9 (disregarding sales by non-defendant "not alleged to have made any false statements"); *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (insider stock sales are not probative of scienter where insider is not a defendant).

Even assuming *arguendo* that such sales are relevant, there is nothing inconsistent or suspicious in their trades. Outside director Mr. Ho sold 180,000 shares during the Class Period (¶ 70), but 185,000 shares in a comparable period before the Class Period, 140,000 during Q2, and 60,000 in Q1. Ex. 29. The other non-defendants, Shehzad Merchant (Chief Technology Officer) (¶ 69), Paul Shinn (Secretary and General Counsel) (¶ 72), and Mr. Wilke (Sr. VP Worldwide Sales) (¶ 71), sold similar or greater amounts in the quarter preceding the Class Period than they sold in the Class Period. Exs. 30-32.

### C. Whether Viewed Individually or Holistically, There Is No Compelling Inference of Scienter.

The Complaint does not offer any cognizable basis to conclude that Messrs. Hooper or Burns acted with scienter. *Tellabs*, 551 U.S. at 326. Rather, when one "compare[s] the malicious and innocent inferences cognizable from the facts pled in the complaint," the far more compelling inference is that Defendants acted in good faith. *Zucco*, 552 F.3d at 991. For nine prior quarters in a row, Defendants had delivered results that exceeded their guidance. Plaintiffs fail to offer any document or witness to suggest that Defendants did not believe they would continue to do so when they gave guidance for Q4 2016 or were otherwise aware of significant contemporaneous facts that undermined it. The supposed evidence of motive – defendants' stock sales – actually refutes any inference of scienter. Although the Company fell 7.6% short of its revenue guidance

for Q4 2016, there is no basis to question the honestly-held expectations of Messrs. Hooper and Burns.[12]

## IV. CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: November 6, 2017

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/Jerome F. Birn, Jr.
Jerome F. Birn, Jr.
jbirn@wsgr.com

*Attorneys for Defendants Gigamon Inc., Paul A. Hooper and Michael J. Burns*

[12] For the reasons set forth above, the Complaint does not adequately allege a primary violation under Section 10(b); therefore, the claim for control person liability under Section 20(a) must be dismissed. *Lipton*, 284 F.3d at 1035 n.15.