United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH RODRIGUEZ,<br><br>  Plaintiff,<br><br>  v.<br><br>GIGAMON INC., et al.,<br><br>  Defendants. | Case No. 5:17-cv-00434-EJD<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. No. 54 |

**I. INTRODUCTION**

In this securities fraud class action suit, Plaintiffs allege that executive officers of Defendant Gigamon Inc. ("Gigamon" or "Company") made false and misleading statements about the Company's revenue and sales backlog in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants Gigamon, Paul A. Hooper ("Hooper"), and Michael J. Burns ("Burns") move to dismiss the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint"). The Court finds it appropriate to take the motion under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). Based upon all pleadings filed to date[1], Defendants' motion to dismiss is granted with leave to amend.

**II. BACKGROUND[2]**

Plaintiffs purport to bring this securities fraud suit on behalf of all persons and entities who purchased or otherwise acquired the securities of Gigamon between October 27, 2016 and

---

[1] The parties' respective requests for judicial notice (Dkt. 56 and 60) are granted.
[2] The Background is a summary of the allegations in the Complaint.

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

1

February 2, 2017 (the "Class Period"). Complaint, ¶ 1. Gigamon is a technology company that provides software and services to other companies. Id. at ¶ 2. Gigamon's products are designed to monitor and control data traveling across internet networks. Id. Hooper is Gigamon's Chief Executive Officer. Id. at ¶ 3. Burns is Gigamon's Chief Financial Officer. Id. Hooper and Burns routinely provided investors with estimates concerning Gigamon's future revenue. Id.

On October 27, 2016, the Company held a conference call with investors and analysts to discuss the Company's third quarter 2016 financial results. Id. at ¶¶ 4, 46. During that call, Defendants provided the public with estimates concerning the Company's revenue and backlog for the fourth quarter, which was almost halfway complete. Id. Hooper stated, "As we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability." Id. at ¶¶ 4, 32, 46. Defendants estimated fourth quarter revenue to be "in the range of $91 million to $93 million." Id. More specifically, Burns stated in pertinent part as follows:

> Now for our Q4 outlook. We're excited to provide the following guidance, using our same disciplined guidance methodology for our fiscal fourth quarter ending December 31, 2016. It's based on non-GAAP results and excludes any stock-based compensation and related expenses. Our large deferred service, healthy product backlog, and consistent quarterly linearity continue to provide good visibility on growth, profits and execution. *We expect fourth quarter revenue in the range of $91 million to $93 million*, 37% year-over-year growth at the midpoint. As we continue to execute on the profit drivers in all aspects of our business, we are confident that we will sustain gross margins at approximately the range of 82% to 83%. We continue to believe that now is a great time for us to invest in our business. We are investing with conviction to expand our security portfolio, deliver next generation technology, and increase sales capacity to ensure continued strong growth next year.
>
> In the fourth quarter of 2016 we also expect to accrue accelerated year-end commissions due to our strong performance throughout the year. As a result, we are forecasting fourth-quarter operating expenses in the range of $54.5 million to $55.5 million. We expect to book a 32% non-GAAP tax provision, and with the diluted share count of approximately 39 million, we expect to deliver non-GAAP earnings per share in the range of $0.36 to $0.38. Achieving the midpoint of our fourth-quarter guidance will bring our 2016 annual revenue growth to 43%, our second consecutive year of accelerating

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

2

> revenue growth. We would deliver annual EPS growth of 56% and would result in annual gross margin above 82% and annual operating margin of 22%.
>
> In summary, the third quarter was another great quarter of execution and we are well-positioned for a strong finish to the year. We continue to see significant demand for our solutions across all of our verticals and plan to next update you on our progress during our fourth-quarter and full-year 2016 conference call preliminarily scheduled for Thursday, February 2, 2017.

Id. at ¶ 47 (emphasis added). These statements led investors to believe that Gigamon "had significant unrecognized revenue, that there were product bookings in the backlog which would significantly increase revenue, and that, overall, increased revenue was guaranteed." Id. at ¶ 48. On October 28, 2016, the first trading day following the conference call, the price of Gigamon's common stock increased from $47.38 per share to $55.01 per share. Id. at ¶ 5.

Unbeknownst to investors, Defendants did not have a reasonable basis in fact for the revenue estimate that they provided. Id. at ¶ 6. "As of October 27, 201[6], Defendants knew that key customers were in the process of deferring purchases that were likely to have a significant negative impact on the Company's revenue for the quarter." Id. "Moreover, Defendants were aware that Gigamon's sales 'backlog' would not be sufficient to compensate for the deferred purchase from this customer, i.e., the Company would not be able to meet its revised revenue estimate by relying on its 'backlog.'" Id.

On November 2, 2016, Hooper mentioned in an interview that Gigamon was expecting $315 million in revenue for the year, "which meant that revenue for the fourth quarter was expected to be approximately $89 million." Id. at ¶ 6. Plaintiffs allege that Hooper's November 2, 2016 statement showed Gigamon was expecting less revenue than what was publicly stated just a few days earlier on October 27. Id.

Plaintiffs allege that Defendants' knowledge about Gigamon's true revenue estimates was materially adverse and not public. Id. at ¶ 7. A number of Gigamon's insiders sold stock while in possession of the material, non-public information. Id. In total, the proceeds from the insider sales amounted to more than $14.5 million, not including Burns' sale of over 20,000 shares of

stock. Id. Plaintiffs allege that these sales were atypical in timing and size and support a strong inference that Defendants acted with scienter. Id.

The truth about Gigamon's fourth quarter revenue emerged on January 17, 2017, when the Company issued a press release entitled "Gigamon Announces Preliminary Fourth Quarter and Fiscal Year 2016 Results." Id. at ¶ 8. The press release disclosed preliminary fourth quarter 2016 revenue of $84.5 million to $85.0 million, compared to the Company's prior guidance of $91 million to $93 million." Id. The press release also quoted Hooper stating that "fourth quarter revenue was below our prior guidance" and that "[f]ourth quarter revenue fell short primarily due to lower than expected product bookings in our North America West region, as several significant existing customer accounts deferred purchasing decisions into 2017." Id. The price of Gigamon's common stock fell $12.65 per share (or 28.7%) to close at $31.40 per share on January 18, 2017. Id.

Two weeks later, during an investor call on February 2, 2017, Defendant Hooper explained that the shortfall was "due to lower than expected bookings in our North America west region, as several significant larger accounts deferred purchasing decisions into 2017." Id. at ¶ 10. Hooper also stated: "We understand that the reasons for the deferrals range from changes in their purchasing patterns to network upgrade decisions that we believe are unrelated to our customer's commitments to add solutions." Id. at ¶ 56. Rex Jackson, the Chief Financial Officer that replaced Burns, stated further that "product backlog at quarter end was $3.1 below our range of approximately $6 million to $8.5 million of proceeding six quarters." Id. at ¶ 10. Between February 2, 2017 and February 3, 2017, Gigamon's common stock declined from $32.10 to $30.40 (or 5.3%). Id.

**III. STANDARDS**

Federal Rule of Civil Procedure 8 requires that a complaint contain a short and plain statement showing the pleader is entitled to relief. A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "tests the legal sufficiency" of the complaint. Navarro v. Block, 250 F.3d 729, 732 (9th

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

4

Cir. 2001). A court may dismiss a claim for "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). In reviewing the sufficiency of a claim, the court accepts as true all of the plaintiff's allegations and construes them in the light most favorable to the plaintiff. In re Gilead Sciences Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

"To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted). Because a section 10(b) claim sounds in fraud, a plaintiff asserting such a claim must satisfy the heightened pleading standard of Rule 9(b), Fed. R. Civ. P. A plaintiff averring securities fraud must plead with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b).

Securities fraud claims must also satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), which states that the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The PSLRA also requires a plaintiff to state with particularity facts giving rise to a strong inference of a defendant's scienter. See 15 U.S.C. §78u-4(b)(2). To plead scienter, a plaintiff must allege "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." Bielousov v. GoPro, Inc., No. 16-6654 CW, 2017 WL 3168522, at *3 (N.D. Cal. July 26, 2017) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 979 (9th Cir. 1999)).

**IV. DISCUSSION**

Defendants move to dismiss the Complaint for two fundamental reasons: the challenged statements are not actionable and the Complaint lacks sufficient facts to support a strong inference

of scienter. As to the first argument, Defendants contend that the challenged statements are forward-looking and protected by the PSLRA's Safe Harbor, vague statements of corporate optimism, and that Plaintiffs have failed to allege particular facts showing that any alleged misstatement was false or misleading when made. As to the second argument, Defendants contend that neither Hooper's November 2 statement nor the stock sales allegations, viewed individual or holistically, are sufficient to support a compelling inference of scienter.

**A. Whether The Challenged Statements Are Forward-Looking**

The Safe Harbor of the PSLRA immunizes forward-looking statements from liability if the statements are (i) "identified as forward-looking" and (ii) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); see also In re Cutera Securities Litig., 610 F.3d 1103, 1112-13 (9th Cir. 2010); City of Royal Oak Ret. Sys. v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1061 (N.D. Cal. 2012). "Under subsection (A)(i), . . . if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." In re Cutera Networks, Inc., 610 F.3d at 1112.

The term "forward-looking" statement means:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE
6

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

### 1. Defendant Burns' Statements

Plaintiffs identify the following statements by Burns as actionable: "Our large deferred service, healthy product backlog, and consistent quarterly linearity continue to provide good visibility on growth profits and execution. We expect fourth quarter revenue in the range of $91 million to $93 million." Complaint, ¶ 47. Plaintiffs contend that the references to "large deferred service" and "healthy product backlog" do not fall within the Safe Harbor because they were false or misleading statements about the present state of Gigamon's affairs, and not forward-looking statements.

Burns' statements are similar to those at issue in In re Quality Systems, Inc. Securities Litigation, 865 F.3d 1130 (9th Cir. 2017). In Quality Systems, the defendants repeatedly made revenue and earnings projections based upon Quality Systems, Inc.'s ("QS") "pipeline" of future business. One individual defendant stated that "opportunities" for sales to first-time electronic healthcare system purchasers "are plentiful," and predicted a revenue range and earnings per share. The defendant characterized these predictions as "quite conservative" given QS's "large" pipeline. Other individual defendants similarly made predictions for revenue growth and earnings per share that were based upon, among other things, QS's pipeline. Id. at 1147-48 ("growing" pipeline; "the state of the current sales pipeline"; "[y]ou wouldn't know that by our pipeline"; "$183 million worth of pipeline"; "the sales pipeline has grown every quarter . . . since February of 2009 and we view it as continually growing"). The Ninth Circuit described these statements as "forward-looking statements made as part of mixed statements in which the non-forward-looking statements were materially false or misleading." Id. at 1146. The Ninth Circuit next considered

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE
7

whether the non-forward looking portions of these "mixed" statements were accompanied with adequate cautionary language under the PSLRA, and concluded that they were not. Id. at 1148. The Ninth Circuit reasoned that the cautionary language used by defendants failed to correct the materially false or misleading non-forward looking statement regarding the current state of QS's pipeline, and therefore reversed the trial court's dismissal of the mixed statements. Id. at 1150.

Here, Burns similarly made mixed statements containing forward-looking and non-forward-looking statements. Burns made a forward-looking prediction about fourth quarter revenue. Burns' forward-looking prediction was accompanied by a non-forward-looking statement regarding Gigamon's "large deferred service," "healthy product backlog," and "consistent quarterly linearity," which provided the factual predicate for Burns' revenue prediction. Plaintiffs contend that the "large deferred service," "healthy product backlog," and "consistent quarterly linearity" refer to the present business conditions at Gigamon. Plaintiffs' Opposition at 15:4-5 ("This refers to a present state of affairs, and is not a projection or forecast.").

Defendants nevertheless contend that the Safe Harbor provision applies because the "large deferred service," "healthy product backlog," and "consistent quarterly linearity" are "assumptions" underlying the revenue prediction that are protected pursuant to 15 U.S.C. § 78u-5(i)(1)(A) & (D). Westley v. Oclaro, Inc., 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012). Defendants' argument is unpersuasive. Burns' statement includes facts regarding the present state of the Company, not assumptions. "To interpret the safe harbor protection of underlying assumptions in the manner suggested by the defendants would allow the exception to swallow the rule. Virtually any factual assertion by a business entity would be subject to safe harbor protection." In re Boeing Securities Litig., 40 F. Supp.2d 1160, 1169 (W.D. Wash. 1998). Defendants' reliance on Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051 (9th Cir. 2014) is misplaced. In Intuitive Surgical, the company issued forward-looking growth and revenue projections for its robotic surgical devices based upon assumptions underlying future economic performance, such as "[g]ynecology plays a bigger and bigger role each day," which the

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

8

court held fell within the Safe Harbor. Id. at 1059. Burns' factual representations regarding Gigamon's existing "large deferred service," "healthy product backlog," and "consistent quarterly linearity" are clearly distinguishable from the "assumptions" regarding gynecology underlying the statements at issue in Intuitive Surgical.

In sum, the non-forward-looking portions of Burns' statement are not protected by the Safe Harbor Provisions of the PSLRA. See Quality Systems, 865 F.3d at 1141 ("We hold a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings.").

### 2. Defendant Hooper's Statement

Hooper's statement that "[a]s we enter our fourth quarter with a healthy backlog, we are on track to deliver our second consecutive year of accelerating top-line revenue growth and expanding profitability" is arguably a forward-looking statement because it contains a projection regarding revenues and profitability. See, e.g., Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., No. 10-03451 LHK, 2012 WL 1868874, at *10 (N.D. Cal. May 22, 2012), aff'd, 759 F.3d 1051 (9th Cir. 2014) (statement that "revenue 'is on track to grow 55% this year'" was forward-looking); Guangyi Xu v. ChinaCache Int'l Holdings Ltd., No. 15-07952 CASR, 2017 WL 114401, at *5-6 (C.D. Cal. Jan. 9, 2017) (statement that company was "on track" to complete migration to new platform was forward-looking); In re ECOtality, Inc. Securities Litig., No. 13-3791 SC, 2014 WL 4634280, at *5-7 (N.D. Cal. Sept. 16, 2014) ("on track to begin delivery in the third quarter to satisfy our healthy pipeline of interest in [the Minit-Charger]" is forward-looking).

Hooper's statement, however, could also be interpreted as a statement about Gigamon's current business condition. See e.g. Bielousov v. GoPro, Inc., 2017 WL 3168522, at *3 ("[w]e believe we're still on track to make [revenue guidance]" is a statement of present opinion and not forward-looking); In re Secure Computing Corp. Securities Litig., 120 F. Supp. 2d 810, 818 (N.D.

Cal. 2000) (in analyzing statement that company was "on track to meet analysts' earnings expectations," the court "accepts [p]laintiffs' representation that they are alleging that [d]efendants misrepresented current business conditions" and concludes that the statement is not forward-looking); In re Copper Mountain Securities Litig., 311 F. Supp.2d 857, 880 (N.D. Cal. 2004) (statement that company was "on track" to meet future goals was not forward-looking "to the extent that such statement[] rested upon a characterization of the present state of the company).

Plaintiffs contend that they are challenging Hooper's reference to "healthy backlog" as a fraudulent representation about the present state of affairs at the Company. Plaintiffs' Opposition at 15:4-5. The Court accepts Plaintiffs' characterization of their claim and will treat Hooper's statement as a mixed statement. It follows that the non-forward-looking portion of Hooper's statement is not protected by the Safe Harbor provisions of the PSLRA. See Quality Systems, 865 F.3d at 1141.

### 3. Defendants' "Cautionary Statements"

Because Burns and Hooper made forward-looking statements as part of mixed statements, the Court next considers Defendants' contention that their statements were accompanied by "meaningful" cautionary language and are therefore protected by the PSLRA's Safe Harbor. "The requirement for 'meaningful' cautions calls for substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." In re Harman Intern. Industries, Inc. Securities Litig., 791 F.3d 90, 102 (D.C. Cir. 2015) (quoting Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 372 (5th Cir. 2004) (some internal quotation marks omitted)). "[C]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [statements] which the plaintiffs challenge." Id. (quoting Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 256 (3d Cir. 2009) (internal quotation marks omitted)).

A boilerplate statement, such as "[t]his is a forward-looking statement: caveat emptor" is not "meaningful" cautionary language under the PSLRA. Id. (quoting Asher v. Baxter Int'l Inc.,

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

10

377 F.3d 727, 729 (7th Cir. 2004). Generalized warnings that statements are "not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them" are also insufficient to satisfy the PSLRA. Id. (quoting Lormand v. US Unwired, Inc., 565 F.3d 228, 244 (5th Cir. 2009) (internal quotation marks omitted)).

The Quality Systems decision is also instructive. In that case, the defendants allegedly made mixed statements that contained predictions about future revenue and earnings per share that were supported by, among other things, positive characterizations about the current state of the defendant company's pipeline. The Ninth Circuit opined as follows with regard to the PSLRA's cautionary language provision:

> Where a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement. If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be "sufficiently meaningful" to qualify the statement for the safe harbor.
>
> \* \* \*
>
> Adequate cautionary language under the PSLRA must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). For cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA, that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement.

Quality Systems, 865 F.3d at 1146-1148.

In the present case, Gigamon issued the following cautionary statement at the beginning of the October 27 conference call:

> During the course of today's presentation, our executives will make forward-looking statements within the meaning of the federal securities laws. Forward-looking statements generally relate to future events or future financial or operating performance. Forward-

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

11

looking statements in this presentation include, but are not limited to, statements related to our business and financial performance and expectations, and guidance for future periods, our expectations regarding our product initiatives and the related benefits, and our expectations regarding the market. Our expectations and beliefs regarding these matters may not materialize, and actual results in future periods are subject to risks and uncertainties that could cause actual results to differ materially from those projected. These risks include those set forth in the press release that we issued earlier today as well as those more fully described in our filings with the Securities and Exchange Commission, including our annual report on Form 10-K and our most recent quarterly report on Form 10-Q. The forward-looking statements in this presentation are based on information available to us as of the date hereof, and we disclaim any obligation to update any forward-looking statements, except as required by law. Please note that other than revenue or as otherwise specifically stated, the financial measures to be discussed on this call will be on a non-GAAP basis. The non-GAAP financial measures are not intended to be considered in isolation or as a substitute for results prepared in accordance with GAAP. A discussion of why we present non-GAAP financial measures and a reconciliation of the non-GAAP financial measures discussed in this call to most directly comparable GAAP financial measures, are included in our earnings press release that's available on our website. On this call, we will give guidance for the fourth quarter of fiscal year 2016 on a non-GAAP basis. We do not make available the reconciliation of non-GAAP guidance measures to corresponding GAAP measures on a forward-looking basis due to the high variability and low visibility with respect to the changes, which are excluded from these non-GAAP measures.

Decl. of Nicholas R. Miller, Ex. 14, p. 3.

Plaintiffs contend that the cautionary statement above was inadequate because it amounted to only a general disclaimer and failed to disclose the true state of the company's backlog as of October 27, which analysts described as "almost nonexistent." Complaint, ¶ 59. Plaintiffs also contend that the cautionary statement was not "meaningful" because Burns and Hooper did not disclose to the public that as of October 27, Gigamon customers had already deferred purchases and that revenue would be less than represented. Plaintiffs' Opposition at 17:22-23 (citing In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp.2d 1132, 1178, n. 62 (C.D. Cal. 2008) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired")).

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

12

Gigamon's cautionary statement and its SEC filings contained extensive lists of important risk factors that could cause its actual revenue results to differ from those forecasted. In particular, Defendants highlight two warnings in Gigamon's Form 10-Q:

- "if we fail to close a large transaction or multiple smaller transactions that we expect to close in a given period, our operating results . . . may be materially adversely affected"; and,

- "[a]ctual results may vary from our guidance and the variations may be material" because of "the timing of orders from our channel partners and end-user customers" or "the budgeting cycles and internal purchasing priorities of our end-user customers . . . ."

Dkt. 55, Ex. 21 at 35, 37, 50. Gigamon also warned that actual results could vary because of "customer acceptance and purchase of our existing products" and "our ability to retain existing customers . . . ." Id., Ex. 3 at Ex. 99.1. Defendants contend that the Company's cautionary statements described the very risk that came to pass and ultimately caused Gigamon to miss its revenue guidance, namely "lower than expected product bookings . . . as several significant existing customer accounts deferred purchasing decisions into 2017." Complaint, ¶53.

Conspicuously absent from the numerous cautionary warnings, however, is any mention of Gigamon's backlog. Plaintiffs define product backlog as including "orders for products scheduled to be shipped within 90 days to customers with approved credit status, and is net of service revenue allocations and any rebates and discounts." Id. at ¶ 29. Construing the Complaint liberally in favor of Plaintiffs, the Court treats the "orders" included in the backlog as firm commitments to purchase that existed as of the date of Defendants' alleged misstatements. Defendants do not explain how Gigamon's cautionary statement about the potential failure to "close" transactions, which presumably refers to future transactions, provides a meaningful warning about orders existing at the time of Defendants' alleged misstatements. Defendants also do not explain how a cautionary statement about the "timing of orders" and "the budgeting cycles and internal purchasing priorities" of customers, which also presumably refer to future orders and future purchasing priorities of customers, provides a meaningful warning about orders existing at

the time of Defendants' alleged misstatements. Because it is not apparent from the pleadings that Defendants' cautionary language corrected the alleged misstatement regarding Gigamon's backlog, it is premature to decide whether the Safe Harbor immunizes Defendants' from liability. See Bodri v. GoPro, Inc., 252 F. Supp.3d 912, 930 (N.D. Cal. 2017) (if there is a legitimate dispute as to whether cautionary language is sufficient, dismissal of claim is not warranted).[3]

**B. Whether the Challenged Statements are "Puffery"**

Defendants next contend that the challenged statements about "healthy" product backlog, "large" deferred service revenue, "consistent" quarter linearity, and "on track" to deliver "accelerating top-line revenue growth and expanding profitability" are vague and subjective statements of corporate optimism that should be dismissed as mere puffery. Defendants characterize these phrases as vague and subjective statements of corporate optimism that cannot support a claim for securities fraud. In response, Plaintiffs argue that Defendants' statements are similar to the statements found actionable in Quality Systems regarding the condition of the company's pipeline.

Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact. Oregon Public Employees Retirement Fund v. Apollo Group Inc., 774 F.3d 598, 606 (9th Cir. 2014). Generalized statements of corporate optimism, such as business is "healthy," may be considered puffery. See Fadia v. FireEye, Inc., No. 14-5204 EJD, 2016 WL 6679806, at *9 (N.D. Cal. Nov. 14, 2016) (statements about business being "very healthy" and sales cycles being "consistent" were non-actionable puffery); see also Intuitive Surgical, 759 F.3d at 1060 (statement that "opportunity for system placement at hospitals 'is still very, very large'" not actionable); In re Nimble Storage, Inc. Sec. Litig., 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery."); In re Rackable Sys., Inc. Sec. Litig., No. 09-0222 CW, 2010 WL 199703,

---

[3] For the same reason, it is premature to determine whether the bespeak caution doctrine precludes liability.

at *6 (N.D. Cal. Jan. 13, 2010) (statements that relationship with customers was "pretty strong" and "solid" not actionable) (citation omitted).

Defendants' statements in this case, however, are not as generalized as those at issue in Fadia, Intuitive Surgical, Nimble Storage, or Rackable. Rather than describing the Company, opportunities, goals, or relationships with customers in broad strokes, Defendants made factual statements regarding certain aspects of Gigamon's business, in particular Gigamon's backlog. In Quality Systems, the Ninth Circuit found that the defendants "went beyond 'feel good' optimistic statements" when they represented that the company's pipeline was "very robust," "deep," at "record levels," and "keeps growing." Quality Systems, 865 F.3d at 1137-1138. According to the Ninth Circuit, the defendants in Quality Systems "did not just describe the pipeline in subjective or emotive terms. Rather they provided a concrete description of the past and present state of the pipeline." Id. at 1144. Consistent with Quality Systems, the Court finds that Defendants in this case went beyond just providing subjective or emotive descriptions of Gigamon's product backlog, deferred service revenue, revenue and profitability. Defendants' challenged statements cannot be dismissed as mere puffery.

**C. Whether Plaintiffs Pled Facts Showing That Challenged Statements Were False or Misleading**

Defendants next contend that the Complaint should be dismissed because Plaintiffs fail to plead contemporaneous facts showing that any of the challenged statements were false or misleading at the time they were made. Plaintiffs cite to Hooper's November 2 annual revenue estimate to show that the October 27 guidance of $91-93 million was false. On November 2, Hooper said that Gigamon was "currently running to around that $315 million revenue this year . . . ." ¶ 6; Ex. 16 at 5. Gigamon's Q3 revenue was $226 million, and the difference between the projected $315 million and previously-earned $226 million is $89 million, which is lower than the October 27 guidance range. ¶ 62; Ex. 16 at 5. The fact that Gigamon's financial results turned out differently from the guidance, however, does not establish that the guidance was false when made.

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE

15

See In re Rackable Sys., Inc. Sec. Litig., 2010 WL 3447857, at *8 (failing to meet projection "does not make the projection a misrepresentation").

Plaintiffs' Complaint also includes information provided by five former sales employees ("CWs") to show Defendants' statements were false when made. Complaint, ¶¶ 37-43. Defendants contend that these employees do not provide any information about Gigamon's Q4 2016 revenue guidelines or the assumptions underlying the guidelines, or what Hooper or Burns allegedly knew about the Q4 2016 guidance or the Company's backlog, deferred service revenue or quarterly linearity. Inexplicably, Plaintiffs do not mention CWs even once in their Opposition, much less attempt to refute Defendants' arguments. The Court treats Plaintiffs' failure to address Defendants' arguments as a tacit acknowledgement of their merit.

Plaintiffs have failed to plead facts to show Defendants' statements were false or misleading when made.

### D. Scienter

Defendants also contend that Plaintiffs fail to allege facts to support a strong inference of scienter. Plaintiffs' counter that scienter can be inferred from Hooper's November 2 statement, as well as the stock sales of the individual Defendants and other officers and directors.

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required statement of mind." 15 U.S.C. § 78u-4(b)(2). "A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Tech., Inc., 856 F.3d 605, 619 (9th Cir. 2017) (quoting Schueneman v. Arena Pharm., Inc., 840 F.3d 698, 705 (9th Cir. 2016). "Deliberate recklessness is 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" Schueneman, 840 F.3d at 705 (italics in original). In ruling on a motion to dismiss, the inquiry is "whether *all* of

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE
16

the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 310 (2007) (italics in original). "A securities fraud complaint will survive a motion to dismiss under Rule 12(b)(6) 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" New Mexico State Investment Council v. Ernst & Young LLP, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting Tellabs, 551 U.S. at 324).

### Hooper's November 2 Statement

Hooper's November 2 statement does not support a strong inference that Defendants made false or misleading statements intentionally or with deliberate recklessness. As Defendants point out, Hooper's choice of words—"currently running to around that $135 million revenue this year"—suggests that Hooper was approximating the annual revenue number. Hooper's November 2 statement cannot reasonably be construed as an admission that Hooper was modifying the Q4 guidance. Indeed Hooper's statement did not prompt analysts at the November 2 conference to announce a change in Gigamon's Q4 guidance.

### Stock Sales

In the Ninth Circuit, only "unusual" or "suspicious" stock sales by corporate insiders may support a strong inference of scienter. In re Silicon Graphics, 183 F.3d at 986. "Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1067 (9th Cir. 2008).

Here, Plaintiffs' stock sale allegations are also insufficient to support an inference of scienter. Hooper sold 45,000 shares of Gigamon stock on October 31, 2016 pursuant to a Rule 10b5-1 trading plan adopted in May of 2015, more than a year before the alleged fraud. This sale occurred days after Gigamon's announcement of Q3 results and represented about 16% percent of his Class Period Holdings. In general, automatic sales made pursuant to Rule 10b5-1 plans do not

support a strong inference of scienter. See e.g. Kotun v. VIVUS, Inc., No. 10-4957 PJH, 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012).[4] Moreover, Plaintiffs have not shown that the timing of Hooper's stock sales is unusual or suspicious. "Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures." Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1037 (9th Cir. 2002). Nor have Plaintiffs shown that the amount and percentage of Hooper's stock sales are unusual or suspicious. "The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter." Wozniak v. Align Techs., Inc., No. 09-3671 MMC, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) (citing Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d at 1067) (finding allegation defendant sold 37% of total stock holdings insufficient; noting "[w]e typically require larger sales amounts-and corroborative sales by other defendants-to allow insider trading to support scienter")). Plaintiffs cite Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004), and argue that "[t]here is no hard-and-fast rule as to how much stock a defendant must sell before he or she can be found to have acted with scienter." Opposition, pp. 23-24. In Oracle, the Ninth Circuit held that defendants' sales were sufficient to support a finding of scienter, even though the sales comprised only 2.1% and 7% of defendants' respective holdings. In doing so, the Ninth Circuit noted, however, that the sales amounted to over $900 million in proceeds. Id. Hooper's stock proceeds in this case are hardly comparable. Further, Hooper's stock sales were consistent with his prior trading history. Hooper sold 45,000 shares in August 2016 and 30,000 shares in each of the prior three quarters, in May 2016, February 2016 and November 2015.

---

[4] Contrary to Plaintiffs' assertion, Plaintiffs' out-of-district cases do not hold otherwise. In Employees' Retirement System of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 309 (2nd Cir. 2015), the defendants entered into 10b5-1 trading plans after the alleged fraudulent scheme began. In Stocke v. Shuffle Master, Inc., 615 F. Supp.2d 1180, 1193, n. 5 (D. Nev. 2009), the defendant entered into a 10b5-1 trading plan during the class period. In contrast, Hooper entered into a 10b5-1 trading plan more than a year before the alleged fraud.

CASE NO.: 5:17-cv-00434-EJD
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND; SETTING CASE MANAGEMENT CONFERENCE
18

As to Burns, Plaintiffs allege that he "sold stock at atypical times and in atypical amounts" without setting forth sufficient facts to support such a conclusion. Complaint, ¶68. Instead, Plaintiffs compare the number of shares Burns held as of September 23, 2016 to those he held as of April 30, 2017, and assume that Burns sold those shares at the highest price during the Class Period. No inference of scienter can be drawn from such speculative allegations, much a strong inference of scienter as required by the PSLRA.

Plaintiffs' allegations of Gigamon stock sales by several non-defendant officers and directors also fail to support an inference of scienter. Plaintiffs allege that Shehzad Merchant, Chief Technology Officer, sold 37,935 shares for $2,166,064.06; Ted Ho, a Director, sold 180,000 shares for $8,731,310.49; Helmut Wilke, Sr. VP Worldwide Sales, sold 8,032 shares for $462,573.40; and Paul Shinn, Secretary and General Counsel, sold 5,064 shares for $293,972.00. Complaint, ¶¶ 69-73. Plaintiffs do not, however, allege any facts to show that these stock sales were unusual or suspicious. In sum, Plaintiffs' allegations, whether viewed separately or holistically[5], are insufficient to raise an inference of scienter.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted with leave to amend.[6] Plaintiffs may file and serve an amended complaint no later than July 30, 2018. The Court will conduct a case management conference at 10:00 a.m. on October 11, 2018. The parties shall file a joint case management statement no later than October 1, 2018.

**IT IS SO ORDERED.**

Dated: July 11, 2018

EDWARD J. DAVILA
United States District Judge

---

[5] Tellabs, 551 U.S. at 310.

[6] Defendants' motion challenges other statements made by Hooper during three analyst conferences and interview. Complaint, ¶ 44. Plaintiffs do not address Defendants' arguments, and thus implicitly concede that Hooper's statements during the three analyst conferences and interview are not actionable. In the event Plaintiffs elect to amend their Complaint, Plaintiffs are precluded from realleging these statements.